[No. A122573. First Dist., Div. Two. Jan. 13, 2012.]

TRANSPORT INSURANCE COMPANY, Plaintiff and Appellant, v. TIG INSURANCE COMPANY et al., Defendants and Respondents.

## COUNSEL

Eisenberg and Hancock, William N. Hancock, Jon B. Eisenberg; Cotkin & Collins, Joan M. Cotkin, Terry L. Kesinger, James R. Carty; Cotkin Law Group, Joan M. Cotkin; Nossaman and Joan M. Cotkin for Plaintiff and Appellant.

Sidley Austin, Mark E. Haddad, Robert B. Martin III and James Harris for Defendant and Respondent TIG Insurance Company.

Lewis Brisbois Bisgaard & Smith, Linda M. Lasley and Caroline E. Chan for Defendant and Respondent Seaton Insurance Company.

## OPINION

**RICHMAN, J.**—This appeal involves the esoteric subject of reinsurance. We resolve it on well-known principles of appellate review.

Appellant Transport Insurance Company (Transport) insured Aerojet-General Corporation (Aerojet) under a liability policy issued in 1973, and that

same year entered into the three reinsurance contracts pertinent here. Numerous suits were brought against Aerojet, and as early as 1980 it begin submitting claims for property damage to Transport, which it denied based on a policy exclusion. Notwithstanding that denial, Transport began paying some investigative expenses, and began to submit claims to the reinsurers. A December 1997 decision by the California Supreme Court held that site investigative expenses could be covered, and in late 1999 Transport finalized a settlement with Aerojet, agreeing to pay $26.6 million. Transport claimed that over $12 million of this was the responsibility of the reinsurers, and in December 1999 submitted its billing and final proof of loss to them.

Years went by without resolution, and in 2006 Transport filed separate lawsuits against each reinsurer, which lawsuits were consolidated. Following a 17-day trial, the jury quickly answered "No" to special verdict questions whether the lawsuits were timely filed, and judgment was entered against Transport.

Transport appeals, an appeal that has generated over 8,000 pages of appendices, 35 volumes of reporter's transcripts, and 425 pages of well-written briefing, including a 180-page appellant's reply brief. And, Transport tells us, the appeal presents two issues of first impression in California, issues "that when decided by this court, will have an impact far beyond the confines of the specific dispute in this case. . . . [T]his court's opinion is likely to become *the* lead authority on issues involving the statute of limitations in reinsurance claims, not only in California, but possibly throughout the nation"—apparently inviting us to publish some lengthy opinion addressing the claimed issues. We decline the invitation, and resolve the appeal under well-settled principles of appellate review, most fundamentally the doctrine of invited error. And we affirm.

## BACKGROUND

### The Insurance Contracts

In July 1973, Transport's predecessor, Transport Indemnity Company, issued to Aerojet a blanket excess liability insurance policy, providing coverage from July 15, 1973, to July 15, 1976. The pertinent limit of liability was "the difference between $1,000,000.00 as a result of any one occurrence or in the aggregate and underlying self-insured retention of $50,000.00 each occurrence." Transport also agreed to defend Aerojet and pay litigation expenses, a defense obligation that had no policy limit.

Following issuance of the policy to Aerojet, Transport entered into three contracts of reinsurance, the contracts pertinent here. The first two reinsurance contracts were with International Surplus Lines Insurance Co., a predecessor to TIG Insurance Company (TIG), one of the two respondents here; the third reinsurance contract was with Unigard Mutual Insurance Co., a predecessor to Seaton Insurance Co. (Seaton), the other respondent. For consistency with the proceedings below and the briefing, we will refer to TIG and Seaton.

"Reinsurance contracts are classified as either 'facultative' or 'treaty.' Reinsurance is facultative if it covers the reinsured's risk on an individual policy. The majority of reinsurance contracts are placed under a treaty, which covers the reinsured's risk for an entire class of policies." (*Prudential Reinsurance Co. v. Superior Court* (1992) 3 Cal.4th 1118, 1126 [14 Cal.Rptr.2d 749, 842 P.2d 48].) As Justice Croskey's treatise explains, "Facultative and treaty reinsurance agreements may be further classified as to the distribution of risk between the original insurer and reinsurer . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2011) ¶ 8:365, p. 8-73 (rev. # 1, 2010).) "Under *pro-rata* reinsurance, the reinsurer assumes a specified percentage of the risk (and premiums)" associated with the particular percentage of the risk (and premiums) associated with "the particular policy or class of policies covered." (*Ibid.*) "Under *excess-of-loss* reinsurance, the reinsurer pays losses only after they exceed a specified amount (the 'retention')." (*Ibid.*)

The coverage details of the reinsurance contracts are not germane to our discussion and will not be set forth in detail. Suffice it to say that the classification of coverage as "pro rata" or "excess of loss" was germane to some of the issues between Transport and the reinsurers, and the subject of much testimony at trial.

One provision in each of the reinsurance contracts is germane, however: when loss was to be paid. As to this, the TIG contracts stated that "Payment of its proportion of loss and expense paid by [Transport] will be made by [TIG] to [Transport] promptly following receipt of proof of loss." The Seaton contract stated that "[p]ayment of [Seaton's] proportion of loss and expense incurred by [Transport] will be made to [Transport] promptly upon receipt and approval by [Seaton] of proof of loss in form satisfactory to [Seaton]."

Transport represents that "reinsurance issues . . . are rarely seen in appellate courts," and its lengthy briefing refers to the claimed dearth of authority pertinent to what it claims are the issues here. We thus digress to discuss reinsurance, and some of the features attendant to it.

## Reinsurance

Reinsurance is defined in Insurance Code section 620: "A contract of reinsurance is one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance." As described in a leading insurance treatise, reinsurance is a contract by which one insurer transfers to another insurer "all or part of the risk it has assumed under a separate . . . policy or group of policies in exchange for a portion of the premium. In essence, reinsurance is insurance for insurance companies. Reinsurance provides insurers with the ability to spread the risk that they have assumed, thereby preventing any one insurer from suffering a catastrophic loss." (1A Couch on Insurance 3d (2010 rev. ed.) Reinsurance, § 9.1, pp. 9-3 to 9-5, fns. omitted (Couch).) The insurer obtaining the reinsurance is called the "ceding insurer."

Our colleagues in Division Four described it this way: " 'Reinsurance is a special form of insurance obtained by insurance companies to help spread the burden of indemnification. A reinsurance company typically contracts with an insurance company to cover a specified portion of the insurance company's obligation to indemnify a policyholder in the event of a valid claim. . . . When a valid claim is made, the insurance company pays the first level insured, and the reinsurance company pays the insurance company. The reinsurance company's obligation is to the insurance company, and the insurance company vis-[à]-vis the reinsurer is thus the insured, or more appropriately the "reinsured." ' " (*Ascherman v. General Reinsurance Corp.* (1986) 183 Cal.App.3d 307, 311–312, fn. 5 [228 Cal.Rptr. 1]; accord, *Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 368 [64 Cal.Rptr.3d 434, 165 P.3d 154].)

One aspect of reinsurance that distinguishes it from other insurance is that reinsurance contracts have no limitation provision, no reference to when suit has to be brought on the reinsurance contract. According to Couch, "As there is typically no special statute of limitations for reinsurance contracts, the statute of limitations for contracts generally will apply." (Couch, *supra*, § 9.33, p. 9-135.)

Among the other distinguishing attributes of reinsurance are the sophistication and expertise of the insured—more accurately, reinsured—which are themselves insurance companies. Another is that the reinsurer does not itself investigate or adjust claims, but relies on the ceding insurer to do that. So, as Transport's briefing repeatedly tells us, the parties are essentially aligned—not adverse. This passage is illustrative: "[R]einsurers must treat their reinsureds with 'utmost good faith.' [Citation.] This duty of extreme good faith arises out of 'the traditional mores of the industry' under which reinsurance is

seen as 'an honorable engagement' where 'gentlemen's agreements' were often secured by a handshake. [Citation.] Indeed, case law has referred to reinsurers and their cedents as 'partners' rather than adversaries. [Citation.] Because of this venerable history, '[d]efences [*sic*] based on available periods of limitation usually have not been taken by insurers in the London [reinsurance] market, and some participants in the market feel that it is a custom not to assert them.' [Citation.] Moreover, this duty of utmost good faith does not terminate when litigation commences. [Citation.]." Indeed, Transport asserts, "Seaton and TIG can hardly feign ignorance of their duty to treat Transport *at all times* with 'utmost good faith,' as that duty was the subject of considerable expert testimony and argument at trial." (Fns. omitted.)

Apparently alluding to this concept in her closing argument at trial, Transport's counsel quoted a "statement that [she] saw written in a reinsurance book, a book that was a whole catalog of cases about reinsurance and how reinsurance works . . . . The quote goes like this: 'Reinsurance is insurance between consenting adults.' "

Seemingly based on the above principles, Transport infers that it is unseemly, if not downright inappropriate, for reinsurers to even think of asserting such a thing as a limitations defense. What might have been, might have been. It is no longer.

The introduction to the chapter on reinsurance in the most recent edition of the other leading insurance treatise makes the point this way: "Reinsurance has emerged from the shadows in the last 20 years. At the time of the publication of the prior edition of this volume and for many decades before that, the reinsurance relationship was a quiet, low-profile backstage business transaction between insurers and their reinsurers. That transaction was carried out as an 'honorable undertaking' or a handshake-based 'gentleman's agreement.' Policyholders and their attorneys saw no reason to probe those relationships, and courts had few occasions to interpret reinsurance contracts or adjudicate responsibility for the payment of losses. For a variety of reasons, including the sheer enormity of actual and potential liability for environmental and other claims and a series of insolvencies hitting both insurers and reinsurers, all that now has changed." (14 Appleman on Insurance 2d (Holmes ed. 2000) § 102.1, pp. 2–3, fns. omitted (Appleman).)

In other words, all issues are fair game, including statutes of limitations, which brings us to the case at the heart of much discussion below, and here: *Continental Casualty Co. v. Stronghold Ins. Co., Ltd.* (2d Cir. 1996) 77 F.3d 16 (*Stronghold*).

### Stronghold

*Stronghold,* decided in 1996 by the Second Circuit Court of Appeals, was an action by Continental Casualty Co. (Continental), a reinsured, against several reinsurers that had refused to pay based on the statute of limitations. The district court ruled against the reinsurers, and they appealed. The Second Circuit affirmed, holding that the causes of action accrued when Continental notified the "reinsurers of its losses under the reinsurance policies and the reinsurers subsequently denied coverage." (*Stronghold, supra,* 77 F.3d at p. 18.) But the Court of Appeals went on: "The timeliness of Continental's claims thus turns on a fairly simple question: when were its losses due and payable under the reinsurance policies? The representative policy offered by the parties is hardly a paragon of clarity. But, we are able to discern at least one condition that Continental had to satisfy before its right to indemnity could mature. 'Loss, if any, under' the policy is 'to be reported to [the reinsurer] as soon as practicable.' . . . [W]e construe the notice provision to mean that Continental had to report any *actual* losses—*i.e.,* payments made on its underlying insurance policies—within a reasonable period of time under the circumstances. [Citation.] We also conclude that Continental was entitled—indeed probably obligated—to wait a reasonable time for the reinsurers to decide whether they would pay or not, and, if so, how much." (*Id.* at p. 20, citation omitted.)

Finally, and apropos Transport's "utmost good faith" assertions here, the court said this: "Although it has been said that the relationship between a reinsured and its reinsurer is not technically a fiduciary one [citation], centuries of history have treated both as allies, rather than adversaries. [Citation.] It is customary, for example, for both to share the premium paid by the underlying insured for coverage. [Citation.] Often they jointly prepare and defend unfounded claims by overreaching insureds. [Citation.] [¶] Because custom and usage have established a gentility and unity of interest between the reinsured and its reinsurer, [citation], a generation ago, we doubt that the defendants would even have considered asserting a statute of limitations defense. [Citation.] With the collapse of prominent British reinsurers, and the financial distress of Lloyd's of London, times may have changed. [Citations.] As François Villon sighed: *Où sont les neiges d'antan?* ('Where are the snows of yesteryear?')." (*Stronghold, supra,* 77 F.3d at pp. 21–22.)

As noted, *Stronghold* was decided in 1996. This is how Appleman described the case in 2000: "The Second Circuit held that, where a reinsurance contract required that losses be reported to a reinsurer, the loss did not become due and payable by the reinsurer and the statute of limitations on an action against the reinsurer did not commence to run until a reasonable time

elapsed after the ceding insurer gave notice of the loss to the reinsurer."[1] (Appleman, *supra*, § 107.1, p. 534.)

That, then, was the setting when the state of affairs between Transport and its reinsurers reached some significant milestones arising out of Aerojet's claims against Transport.

## The Claims

Aerojet's primary business was the development and production of missile and rocket motors for NASA and the armed forces. Aerojet was sued in a number of actions alleging damages caused by toxic contamination of groundwater involving pollution at Aerojet sites in Rancho Cordova and Azusa, California, and began submitting claims to Transport as early as 1980, including for both loss and expense. Though Transport did start paying some expenses, it denied the claims for loss based upon a pollution exclusion. This ultimately led to much litigation, including, most significantly, the case leading to the opinion filed by the Supreme Court on December 29, 1997: *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38 [70 Cal.Rptr.2d 118, 948 P.2d 909] (*Aerojet*). There, following long and tortuous litigation through the lower courts (*id.* at pp. 47–50), the Supreme Court held that while Transport had no duty to pay Aerojet's losses at Rancho Cordova, if certain criteria were met site investigation expenses might constitute defense costs covered under the policy. The Supreme Court remanded the case to the Court of Appeal, to be sent back to the trial court. (*Aerojet, supra*, 17 Cal.4th at pp. 61, 77.)

Following a mediation, in September 1999 Aerojet and Transport entered into a settlement by which Transport agreed to pay $26,655,000 in exchange for a release of all claims under the Aerojet policy, including for both Rancho Cordova and Azusa. The settlement agreement did not allocate the amount between loss and expense, or between Rancho Cordova and Azusa.

According to Transport's brief, with this settlement "the reinsurers' contractual obligation to pay for their proportionate share of the Aerojet claims arose." And "[b]y letter dated December 20, 1999, Transport submitted its final billing in the Aerojet matter to TIG, seeking the full amount of its

---

[1] *Ario v. Underwriting Members of Lloyd's of London* (Pa.Commw.Ct. 2010) 996 A.2d 588, 597, the case cited to us by Transport after the briefing was closed, describes *Stronghold* similarly: "In *Continental Casualty*, where the policy established that loss covered under the policy must be reported to the reinsurer 'as soon as practicable,' the court concluded that the insurer's cause of action for payment did not arise until notice of loss was provided to the reinsurer and the reinsurer was afforded a reasonable time in which to decide whether and how much it would pay."

reinsurance claim, a total of $6,608,039. [Citation.] This was sent on Transport's behalf by Vito Peraino . . . . Peraino sent the letter to William Pascale, TIG's manager of assumed reinsurance claims. [Citation.] The letter stated: [¶] We have finalized our billings, having assembled all prior payments, and enclose our billing to you for this matter. As this matter was rather complex and carries with it a bit of history, we would like the opportunity to meet with you to present our claim, and to answer any questions you might have."

As to Seaton, Transport says that "On or about December 20, 1999, Mr. Peraino initiated the claims process with Seaton by submitting Transport's initial proof of loss," which proof of loss was accompanied by a letter with language identical to that quoted above. And, Transport says, "As with the TIG claim, it is this final billing that is controlling for the purpose of the causes of action asserted here."

Much of the testimony at trial focused on the numerous communications between Transport and the reinsurers that ensued, and hundreds of exhibits were introduced. Similarly, much of the parties' briefing sets out these communications in great detail.[2] We do not consider these communications pertinent to the issues before us and do not recite them. However, a few facts are pertinent here, especially apropos Transport's "utmost good faith" assertions, facts that occurred primarily during the seven-plus years that the *Aerojet* coverage litigation was ongoing. Those facts include communications within Transport and with its counsel and show that Transport was aware that the statute of limitations could be an issue—an awareness that existed even before *Stronghold* was decided. Here are some examples.

In 1994, Chet Nalepa, senior vice-president at Transport's sister company, American Empire Surplus Lines Insurance Company, began to assist in Transport's collection efforts, and brought in outside counsel at Lord, Bissell & Brook, seeking advice regarding TIG's "consistent denials of liability." Nalepa also sought an update from Transport regarding its earlier threat of litigation, emphasizing that because of its size, the claim "is a matter of substance and requires attention to detail." Transport did not respond, and Nalepa ultimately closed his collection file.

In late 1996, Nalepa retained counsel at a second law firm, Deborah Cohen of Pepper Hamilton & Scheetz (Pepper Hamilton), which had assisted Transport in another matter. As his letter to Ms. Cohen put it: "We are getting

---

[2] In fact, the claimed reasons for Transport's overlength reply brief are that the reinsurers' respondent's briefs do not accurately recite the evidence and cite "irrelevances," and that because the primary issue is "whether the trial court committed instructional error, Transport is entitled to view and present the trial evidence *in the light most favorable* to the claim of instructional error."

involved in this effort because of [a prior] litigation you have filed . . . . I've spoken to Eve Rosen and she has blessed our involvement at this point. I am hopeful that your office will be able to assist Transport further in recovering what appears to be long overdue reinsurance proceeds." Nalepa's letter ends with this: "This file is troublesome from a number of aspects and your considered legal opinion will be helpful."[3]

By November 1996, Pepper Hamilton had drafted a complaint against another of Transport's reinsurers, and a note on the front of the draft asked whether other reinsurers, such as Unigard, Seaton's predecessor, should be added as a defendant.

Ms. Cohen communicated with Transport several times about the statute of limitations, including, for example, in a July 1997 memorandum where she expressed concern about the possible application of the statute of limitations, and advised that the issue could "not sit." A November 19, 1997 letter from Ms. Cohen was similar, expressing "concern about the statute of limitations on some of these billings."

Following the December 1997 Supreme Court decision in *Aerojet, supra*, 17 Cal.4th 38, Ms. Cohen wrote Nalepa, advising Transport that it should update its billing to TIG, "provide a reasonable time period" for questions, and then demand payment, and "[i]f payment is not made, litigation should be commenced. . . ." In July 1998, Transport sent updated bills to TIG for expenses, stating that "all billings are due 30 days after receipt."

In June 1999, Transport sent another bill to TIG, accompanied by a cover letter drafted by Ms. Cohen, which letter she described as follows: "I have tried to 'wordsmith' the letter to set this up for litigation."

Following the September 1999 settlement with Aerojet, Transport brought in a third law firm, Luce Forward, Hamilton & Scripps (Luce Forward), to allocate the settlement between the Aerojet sites and between loss and expense, in order to bill the reinsurers. Some issues arose as to just how to apportion, and one attorney at Luce Forward told Transport that "it is unlikely that anyone is just going to write a check" regarding the proposed allocation, and another that his "expectation was that the matter was likely to go to litigation at the end of the day." They also warned Transport regarding the

---

[3] At trial, Nalepa testified as follows: "I, quite frankly, to this day don't know what Transport was doing with [its collection efforts] and who had the responsibility at their end."

statute of limitations.[4] Transport's Rosen "understood [in 1999] that ultimately there was going to be some litigation." Indeed, in September 1999, attorneys at Luce Forward drafted a complaint by Transport against TIG and Seaton.[5]

It was not until many years later that Transport filed any lawsuit.

### Transport's Lawsuits

On January 26, 2006, Transport filed a complaint against TIG, followed four days later by a complaint against Seaton. Both complaints alleged two causes of action, for declaratory relief and breach of contract, based on the respective reinsurer's failure to pay its proportionate share of the Aerojet settlement.

TIG filed its answer on March 7, 2006, Seaton on April 10. Both asserted the affirmative defense that Transport's claims were barred by the four-year statute of limitations applicable to breach of contract claims. (Code Civ. Proc., § 337, subd. 1.) The actions were later consolidated.

### The Motions for Summary Adjudication and Summary Judgment

On April 27, 2007, Transport filed motions for summary adjudication, the first against TIG, the second against Seaton. The motions were addressed to the affirmative defenses, and argued that as a matter of law Transport's claims were not barred by the four-year statute of limitations for contract claims. Transport's brief describes its motions this way: "As authority, Transport cited (and quoted extensively from) *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 693 [274 Cal.Rptr. 387, 798 P.2d 1230] and *Forman v. Chicago Title Ins. Co.* (1995) 32 Cal.App.4th 998, 1003–1004 [38 Cal.Rptr.2d 790], which hold that the statute of limitations is *tolled* during the time an insurer is investigating a first party insurance claim."

Significantly, in its motions below Transport also cited *Stronghold*, a citation not mentioned in its brief to us. And as to *Stronghold*, Transport said that the court there observed "that, as a general matter, New York law requires both (a) a demand for payment and (b) either a 'rejection' of that demand or lapse of a reasonable time for payment."

---

[4] Seaton requests judicial notice of material it asserts might be germane, and TIG's brief also mentions this. We deny the request for judicial notice.

[5] According to Transport, this and the earlier draft complaint are of no significance because they were for declaratory relief only and did not contain a cause of action for breach of contract.

TIG and Seaton filed opposition to Transport's motions, and also their own motions, each seeking summary judgment based on the statute of limitations defense. These motions also cited *Stronghold*. So, too, did Transport's opposition to the reinsurers' motions and its reply on its own motion. For example, its opposition to Seaton's motion said "that *Stronghold*, the only reinsurance case dealing with the issue—is fully consonant with California law, and fully supports Transport's position." "Seaton [argues] there were two possible dates for accrual under New York law, the first being when the reinsurer denied coverage, and the second being after a reasonable period of time after a claim is submitted. [¶] Seaton's position is squarely contradicted by controlling California law. *Stronghold* is fully consonant with *Prudential-LMI*[, *supra*, 51 Cal.3d 674] to the extent each case teaches that the limitations period does not run during the claims process, and only commences or reactivates [when] the insurer has formally and unequivocally denied the claim."

Transport's reply on its own motion asserted that "The custom and practice of the industry confirm that the claims did not accrue until a final offer or denial was communicated. The only reinsurance case on point, *Stronghold*, confirms this. Further, California coverage law comes to the same result via the *Prudential-LMI* line of cases where the statute is tolled while the insurer investigates and negotiates the claim."

The four motions were heard on March 7, 2008, before the Honorable Charlotte Woolard, who began by announcing her rulings on the numerous evidentiary objections. She then turned to announcement of the "tentative rulings regarding the motions that bring us here today," and in connection with Transport's motions referred to "equitable tolling" and "equitable estoppel."[6] After Judge Woolard completed her tentative rulings, counsel for TIG argued at length against the applicability of equitable tolling. Similarly, counsel for Seaton asked that Judge Woolard "take another look" at *Prudential-LMI*.

On April 4, 2008, Judge Woolard issued two orders, each addressing Transport's motion against the particular reinsurer and that reinsurer's motion

---

[6] Focusing on Judge Woolard's comments in her tentative ruling, and that her subsequent order did not contain what she said, Transport's brief says things such as this: "[T]he trial court did not expressly address the equitable tolling issue in its written rulings, but clearly ruled *against* Transport on this issue because it did not include equitable tolling in the rule it ultimately adopted, despite Transport's detailed argument on this point in its moving papers. [Citations.] . . . Given that, in its tentative ruling, the trial court indicated it *would* apply equitable tolling [citation] but, after hearing TIG's arguments on this issue [citations], it excluded equitable tolling from its written ruling, we would . . . argue that the trial court *unquestionably* 'determined that equitable tolling should not apply.' " As will be shown, this is an overstatement.

against Transport, orders that were thorough indeed, with lengthy discussions of the law. The two orders were similar—in fact, in great part identical—and as relevant here, provided in pertinent part as follows: "The parties have not cited, and the court has not found, any reported California decision addressing the question of when a cause of action for breach of reinsurance contract *accrues*. A persuasive decision from the Second Circuit Court of Appeals is most directly on point. In *Continental Cas. Co. v. Stronghold Ins. Co., Ltd.*[, *supra*,] 77 F.3d 16, the Second Circuit held that, under New York law, a reinsurance cause of action accrues 'when the loss insured against becomes due and payable under the policy.' [Citation.] Looking to the policy at issue, the court found that the reinsured was required to report its losses within a reasonable period of time. [Citation.] The onus was then on the reinsurer to decide, after a reasonable amount of time in which to make its coverage determination, whether it would pay the claim. [Citation.] Under these circumstances, the Second Circuit found that the plaintiff's causes of action accrued after the plaintiff submitted its claims to the defendant, and either: (1) the defendant denied the claim; or (2) a reasonable period of time elapsed without a decision from the defendant. [Citation.]"

From there, and addressing, for example, the Seaton-related motions, Judge Woolard went on to note that "[A]fter Transport submits a proof of loss, Seaton allegedly breaches the contract, and Transport's causes of action accrue, where (1) Seaton denies a covered claim; or (2) Seaton takes an unreasonable amount of time to communicate its coverage decision. From that point, Plaintiff has four years in which to file its action against Defendant." And from there, Judge Woolard went on to deny the motions on the ground that "triable issues exist as to whether Seaton *ever* formally denied Transport's claims reflected in the 1999 [proofs of loss] and when the causes of action nonetheless accrued after a reasonable amount of time passed for Seaton to have evaluated the claims." The analysis in the order as to the TIG-related motions was similar.

### The Trial

The case proceeded to a jury trial, which began on May 12, 2008. As that trial is described by Transport: "The coverage dispute here included the defendant reinsurers' contentions that: (1) the facultative reinsurance certificates did not mean what they stated and are 'excess of loss' certificates as opposed to pro rata; (2) Transport suffered no loss to be reinsured; and (3) Transport allegedly made a bad faith allocation to the reinsurers of the underlying settlement." And, of course, there was the issue of the statute of limitations.

The parties had submitted trial briefs, and as to the statute of limitations issue Transport's brief said this: "The Defendants' first stated defense focused

primarily on statute of limitations which fails under the holding of *Stronghold* decision and pursuant to this Court's orders denying the motions for summary judgment. As this Court well knows, *Continental Casualty Co. v. Stronghold Insurance Co.*[, *supra*,] 77 F.3d 16 held that the statute of limitations does not start to accrue until the reinsurance claim is denied. In passing discussion, the *Stronghold* court also noted that an alternative time would be a reasonable time following submission of the final proofs of loss if the reinsurer did not act upon the final proofs. This Court referenced both accrual tests in the orders finding triable issues of fact and denying the summary judgment motions."

Transport had also filed its objections to TIG's special instructions, which as pertinent here, included the following: "Special Instruction No. 2: Violates this Court's Orders on the statute of limitations affirmative defense. The issue is when the claims accrued: the four year time period accrued either when TIG definitively denied the claim; *or when a reasonable period passed after submission of the final proofs of loss.*" (Italics added.)

Prior to trial Judge Woolard dealt with in limine motions, one of which was TIG's motion to bifurcate, to try first the statute of limitations defense. Judge Woolard indicated her inclination to deny the motion, following which counsel for TIG attempted to convince her to change her mind. Replying, counsel for Transport argued as follows: "Your Honor, that completely misstates the issue in a reinsurance context. It's a rehash of their failed summary judgment motion. That was one of the arguments that they made in their motion, and it was rejected by this Court in favor of applying the holding of *Stronghold* which the Court found the persuasive authority as the only authority relevant to the issue of accrual. [¶] . . . [¶] Our claim is a breach of contract claim which under the holding of *Stronghold* and this Court's adoption of that holding in this case as the law in the case, it accrues when TIG or Seaton denied the claim. And that's when the four years start, or a reasonable time after submission of the final proofs of loss, which goes into, of course, custom and practice on all fronts including supplementing proofs of loss."

The jury instruction ultimately given on the statute of limitations was as follows: "Affirmative defense statute of limitations. [¶] In this case, Transport's claims against the defendant accrued after Transport submitted its claims to defendants and when, one, defendants denied the claims, or, two, a reasonable period of time elapsed after the submission of the claims without a decision by the defendants. [¶] If Seaton either denied the claims or a reasonable period of time elapsed following submission of the claims by January 30, 2002, Transport's claims against Seaton were filed too late and are time barred. [¶] If TIG either denied the claims or a reasonable period of

time elapsed following submission of the claims by January 26, 2002, Transport's claims against TIG were filed too late and are time barred."

The genesis of this instruction is central to the issue here and will be discussed in detail below. Suffice it to say here that at the least Transport agreed to this instruction—if it did not propose it.

The parties agreed to submit the matter with special verdict forms as to each reinsurer, asking the jury to answer specific questions, the first of which was, "Do you find that Transport timely filed its lawsuit against [the particular reinsurer]?"

Transport's closing argument was late in the afternoon of June 5, following which Judge Woolard gave her concluding instructions, instructed the clerk to swear the bailiff, and the matter was then in the hands of the jury. It was "close to 4:30." At 11:16 a.m. the next morning, the jury returned with the verdicts, answering "No" to the two questions numbered 1.

Judgment was entered on June 9.

### The Motion for New Trial

On June 27, Transport filed a motion for new trial, asserting two grounds: (1) insufficiency of the evidence to support the verdict and (2) instructional error, the inclusion of "the second prong of *Stronghold*" and failure to instruct on equitable estoppel. On the second ground, the motion contended that "the Court erred because nowhere in *Prudential*—controlling California Supreme Court precedent—does the court peg the length of the statutory limitations period to something as vague as a 'reasonable time' after the insured submits a claim. For that matter, neither does the holding in *Stronghold*. To the contrary, it is consistent with *Prudential* in requiring a denial before the statute can expire."

Following opposition and reply, the motion came on for hearing on July 25, and on July 30, Judge Woolard denied it. On August 19, Transport filed its notice of appeal.

### ANALYSIS

#### Transport Agreed to the Statute of Limitations Instruction, If It Did Not Propose It, and Any Claim That It Was Erroneous Is Barred By the Invited Error Doctrine

Transport's first argument is that "the trial court's instructions regarding the statute of limitations was prejudicially erroneous because it contained

an incorrect statement of law regarding accrual and utterly failed to address tolling." We conclude that the argument is barred by the doctrine of invited error.

 "Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [285 Cal.Rptr. 99, 814 P.2d 1341] (*Mary M.*) and cases cited.) As a leading treatise puts it, an appellant "cannot complain of error [it] personally 'invited.' In other words, one whose conduct induces or invites the commission or error by the trial court is *estopped* from asserting it as a ground for reversal on appeal." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 8:245, p. 8-161 (rev. # 1, 2010), citing *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79] and *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 950 [90 Cal.Rptr.3d 247].)

We have described the doctrine this way: it is " 'an "application of the estoppel principle": "Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal" on appeal. [Citation.] . . . At bottom, the doctrine rests on the purpose of the principle, which is to prevent a party from misleading the trial court and then profiting therefrom in the appellate court. [Citations.] . . . .' " (*Munoz v. City of Union City* (2007) 148 Cal.App.4th 173, 178 [55 Cal.Rptr.3d 393].)

It has been said that the invited error doctrine "applies 'with particular force in the area of jury instructions. . . .' " (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 [57 Cal.Rptr.2d 525]), and numerous cases have held that a party who requests, or acquiesces in, a particular jury instruction cannot appeal the giving of that instruction. (See, e.g., *Nevis v. Pacific Gas & Electric Co.* (1954) 43 Cal.2d 626, 629–630 [275 P.2d 761]; *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 [176 Cal.Rptr. 239] and cases cited; *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 567 [140 Cal.Rptr. 330] [jointly-proposed instruction].)

Claiming to describe what occurred before Judge Woolard, Transport's brief asserts that "[p]rior to closing arguments, the court and counsel discussed the various jury instructions the parties had submitted. [Citation.] Seaton's trial counsel submitted a statute of limitations instruction (on its own caption) which tracked the trial court's prior ruling on the summary adjudication motions. [Citations.] The court accepted this and instructed the jury."

Transport's description as to the origin of the instruction is less than candid: it had as much to do with the instruction, if not more, than did Seaton.

The instruction was the subject of lengthy argument below, 10 pages to be exact. It arose in the context of, as Judge Woolard described it, "Jury Instructions Disputed by Transport," and specifically in Transport's argument that TIG had "agreed" to a different instruction than the one it proposed. The claimed "agreed" to instruction was the one to which Transport and Seaton had agreed—the instruction Transport now complains of here.

So, to set the stage for that discussion, counsel for Seaton advised Judge Woolard that "[a]lthough [the instructions] are on my caption, . . . [t]hey are basically there because they are the result of our conference. And we have retyped some of them and some of these have mine on the side because they basically are on my letterhead, *but not necessarily proposed by me.*" (Italics added.) Judge Woolard thanked Seaton's counsel for being "kind enough to take the laboring oar on having all of this produced so that we could address it in a reasonable fashion," and then went to the argument: "The first one is Special Instruction Number 2, Affirmative Defense Statute of Limitations."

The next person to talk was counsel for Transport, who asserted that TIG's proposed instruction "does not track the Court's ruling or the case law in *Stronghold*. And, in fact, we have an agreed instruction, . . . if you look at the last document, there is an agreed instruction on an affirmative defense statute of limitations which specifically tracks the court's ruling. That's why it's agreed. This one [(the instruction proposed by TIG)] does not and should not be given."

Lengthy argument ensued, with counsel for TIG urging that its proposed instruction be given.[7] Counsel for Transport vigorously argued otherwise, urging that Judge Woolard give the instruction it had agreed to with Seaton. This instruction, Transport's counsel stated, "is, in fact, tracking the Court's—I mean there is reason why *Seaton agreed to it.* It is directly language in the Court's ruling. . . . Obviously it's a reasonable period of time after something, and the after something was after the claims were submitted. . . ." (Italics added.)

---

[7] *TIG's proposed instruction would have told the jury: "TIG contends that Transport filed this lawsuit too late. To establish this defense, TIG must prove that this action was not commenced within four years of the date on which the claim sued on arose. You must decide when the claim arose, that is when TIG failed to pay the amounts allegedly due under the terms and conditions of [policies] FR 297 and FR 298. If TIG's failure to pay the alleged amounts due took place before January 26, 2002, Transport's lawsuit was filed too late and is barred by the statute of limitations."*

Counsel for TIG replied, himself citing to *Stronghold*, to which counsel for Transport responded as follows: "The court looked at the contentions made by the parties here and . . . there is not an issue of late notice here either. So the issue is as the court described it, either they gave us a definitive denial at which time the clock would start ticking or the claims were submitted and there was no further communication after they were submitted and a reasonable time passes. That's the issue. [¶] It can't be the way they want it in the abstract. It's confusing to the jury. It's not the standard adopted by this court in the ruling where the court literally said, under these circumstances the second circuit found that plaintiff's causes of action accrued after the plaintiff submitted its claims to defendant and either one, the defendant denied the claims, or two, a reasonable period of time elapsed without a decision from the defendant. [¶] It's obviously not a reasonable period of time elapsed in the abstract. . . . [T]hey want to make it as abstract as possible to slant things in their favor, but that's not the law of the case here. And that's why Seaton and Transport have agreed on this language . . . , and we thought we had an agreement from TIG and obviously we don't."

Counsel for TIG reiterated that "he quoted from *Stronghold*"; Transport's counsel responded briefly, followed by more argument from counsel for TIG. Then, Transport's counsel said this: "The standard has to do with when does a breach of contract claim accrue, not when could you sue. When does the breach of contract claim accrue. And what *Stronghold* was looking at was [a] different set of factual circumstances. . . . [¶] So then the opinion in *Stronghold*, the actual holding in *Stronghold* is just the first standard. . . . And that is actually consistent with the custom and practice testimony we received in this trial. What the Court did in ruling on the adjudication motions [it] used *Stronghold* as a guide, but adapted the *Stronghold* decision to the facts as presented in the cross-motions for summary judgment. And that's why on page 3 . . . of the ruling, the court specifically found that the cause of action starts to accrue when the claims are denied or when a reasonable period of time has elapsed after submission of the claim without a decision by the defendants."

Following a brief interchange, counsel for Transport went on with more references to *Stronghold*: "Your Honor, if we were going to go purely on the *Stronghold* decision and not the Court's orders, which is the law of the case, the[n] we have to only have the first standard, which is the statute only begins to accrue when the defendants denied the claims because that was literally the holding. The rest of the language in the opinion is really dicta, explaining the circumstances of . . . *Stronghold* in [the] particular situation which is not our situation. . . ."

To this Judge Woolard replied as follows: "But I found the dicta to be persuasive. I am just wondering if I misspoke in my writing of these orders."

Saying nothing in response to Judge Woolard's observation, counsel for Transport went on for two more pages. Finally, Judge Woolard asked if there was anything further, and counsel for TIG replied: "Just that counsel misstated what happened in *Stronghold*. It was stipulated that notice was timely. The only issue in *Stronghold* was accrual, and the Court has already read *Stronghold* and understands its prongs. And I read from page 21 of the opinion what the prongs were and that the additional language we are objecting to doesn't appear and that's why we are objecting."

Judge Woolard then ruled: she would "give the affirmative defense statute of limitations . . . as what I thought to be the agreed-upon jury instruction. [¶] Regarding the special instructions that TIG has submitted for statute of limitations, the Court is not going to give that."

Seeking to avoid application of the invited error rule, Transport quotes language from *Mary M., supra*, 54 Cal.3d 202, 212–213, a case it cites numerous times in its brief. The quoted language includes this: "But the [invited error] doctrine does not apply when a party, while making the appropriate objections, acquiesces in a judicial determination. [Citation.]" And this: " 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' " *Mary M.* does not avail Transport. What happened there is a far cry from what happened here.

The issue in *Mary M.* concerned the possible vicarious liability of the City of Los Angeles for the conduct of Police Sergeant Schroyer who while on duty raped a woman he had detained. As of the time of trial one case had held that the plaintiff had stated a valid cause of action against the county for the intentional misconduct of a deputy sheriff, that the sexual misconduct " 'flowed from the very exercise of [his] authority.' " (*Mary M., supra*, 54 Cal.3d at p. 210.) That case was *White v. County of Orange* (1985) 166 Cal.App.3d 566 [212 Cal.Rptr. 493], and the trial judge in *Mary M.* gave an instruction based on that case. (*Mary M., supra*, at p. 211.)

"[B]ecause the record indicated that the City had requested the instruction, [the Supreme Court] solicited briefing from the parties to determine whether the doctrine of invited error should bar the City from contending that, as a matter of law, Sergeant Schroyer was acting outside the scope of his employment when he raped plaintiff." (*Mary M., supra*, 54 Cal.3d at pp. 211–212.) The Supreme Court held for the City, that the doctrine should not apply, but not on any basis providing solace to Transport. Rather, it was because of the City's position throughout, which the Supreme Court described as follows:

"The record shows that the instruction was proposed under the following circumstances. Throughout the proceedings in this matter, the City challenged the decision in *White* v. *County of Orange, supra,* 166 Cal.App.3d 566. The trial court correctly considered itself to be bound by the appellate court's decision in *White.* [Citation.] At the instruction conference, the court told the parties that notwithstanding the City's objections, it would instruct the jury in accordance with *White,* and that unless the City proffered an alternative instruction it would give plaintiff's proposed instruction, which was based on *White.* The City then submitted, and the court gave, the instruction quoted above.

"Immediately after the case was submitted to the jury, the trial court gave the parties an opportunity to 'tie up any loose ends' relating to any matter that had not yet been 'put on the record.' Counsel for the City then explained the circumstances which led it to submit the instruction at issue: '[D]uring our many, many hours of discussions concerning jury instructions, I did indicate to the court that we did not believe that *White* was an appropriate case with which the jury should be instructed as it was . . . not an appropriate statement of the law. [¶] The court indicated that it would follow *White* and unless I wanted Plaintiff's instructions to be the ones to go to the jury, I would be requested to draft an instruction based upon the language in *White.* [¶] In response to that, the defense submitted an instruction based upon *White* which the court . . . read to the jury. [¶] For the record, I would like it to be clear that we do not believe that *White* is the authority that should be followed and that we objected to giving any instructions in accordance with the *White* case, albeit, we did submit an instruction based upon the court's request.' The trial court agreed with counsel's account, but pointed out that the precise wording of the instruction was the City's." (*Mary M., supra,* 54 Cal.3d at p. 212.)

After reciting the doctrine of invited error, the Supreme Court went on with the language quoted above on which Transport relies. And then it went on further: "Here, the City did not invite the trial court to instruct the jury that liability for a sexual assault can arise from a police officer's exercise of official authority. To the contrary, it took the opposite position throughout the case, including the instruction conference. The City never *induced* the trial court to follow *White* . . . ; it merely acquiesced—after objecting—to the court's decision to instruct in accordance with *White,* and submitted an instruction in accordance with that decision. Although the City would be barred from attacking the specific language of the jury instruction it submitted, it is, under the circumstances of this case, not precluded from asserting that *White* . . . was erroneously decided . . . ." (*Mary M., supra,* 54 Cal.3d at pp. 212–213, fn. omitted.)

As demonstrated above, the conduct of Transport's counsel is nothing like that of counsel for the city in *Mary M.*, who "[t]hroughout the proceedings . . . challenged the decision," who " '[d]uring . . . many, many hours of discussions' " indicated that the law was wrong, and was not " 'an appropriate case with which the jury should be instructed.' " Put otherwise, the invited error doctrine did not apply because the party acquiesced "while making the appropriate objections." (*Mary M., supra*, 54 Cal.3d at p. 212.) That hardly describes Transport's conduct here.

In *Electronic Equipment Express Inc. v. Donald H. Seiler & Co., supra*, 122 Cal.App.3d 834, our colleagues in Division Three were met with a similar argument as that Transport makes here. Rejecting it, and the many cases the appellant had cited, the court held as follows: "In all of [the cases cited] the party alleging error had strenuously made his objection and then acted defensively to lessen the impact of the error. No waiver can be predicated on this course of action. [Citation.] Here appellants did not formally make an objection except to offer an alternative definition, and they ultimately and expressly stated that they had no objection to the court's definition. The error was thus waived." (122 Cal.App.3d at p. 857.) Here, as noted, Transport agreed to—if it did not propose—the language in the instruction. It did not object, let alone "strenuously."

Transport's opening brief, referring generally to arguments made in reply to the opposition to its new trial motion, essentially asserts that it "acquiesced" in the agreed-to instruction that Judge Woolard virtually "insisted" on giving, at one point describing the instruction as one she "craft[ed]." As Transport's counsel acknowledged at oral argument, Judge Woolard did not craft the instruction. And the only insistence was by Transport's counsel.

A May 25, 2008 e-mail from Transport's counsel to opposing counsel dealing with the proposed jury instructions was put before Judge Woolard in TIG's opposition to Transport's new trial motion. The e-mail reads in pertinent part as follows: "Per our discussions on Friday, I would appreciate a copy of the list of instructions to which we agreed . . . and I would appreciate any revisions of the specials that Defendants might want to offer . . . . *As to the 'affirmative defense' of statute of limitations, we must insist that the specific language of the court's order (derived from the* Stronghold *decision) be used and suggest the following wording should be used*," going on to propose language essentially identical to that in fact contained in the instruction given. (Italics added.)

In its reply brief, Transport asserts that "When this court applies the *actual* invited error doctrine to the *actual* facts of this case—where it is clear Transport in fact objected to the 'reasonable time' prong (5 AA 1194)—the

court will inevitably conclude that Transport's trial counsel did not 'invite' error and has properly preserved the important issues this case presents for appeal." We conclude otherwise.

The sole record reference—AA 1194—is Transport's brief attempt in its reply to Seaton's opposition to its motion for summary adjudication to distinguish *Stronghold*. That brief attempt was in its reply memorandum, quoted above, a memorandum of November 28, 2007. Transport cites to nothing between then and the June 5, 2008 court session when the instructions were settled in any way objecting to the language.

At another place Transport's reply asserts that its counsel agreed to the instruction "because the trial court had already ruled on the pertinent legal issues . . . and the instruction accurately tracked the court's prior (albeit erroneous) legal ruling on the law." And, Transport goes on, its "counsel had little to gain by continuing to dispute a legal issue the court had already decided . . . and possibly something to lose (aggravating the trial judge, who was still conducting the trial)."

We offer two observations. First, the claim that advocating a position with an experienced judge would somehow "aggravate" her is sheer speculation— not to mention demeaning. Beyond that, as the Supreme Court confirmed in *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107 [29 Cal.Rptr.3d 249, 112 P.3d 636], there is nothing binding about a trial judge's ruling on a motion for summary adjudication, as such a ruling can be revisited on the court's own motion: "We hold that [Code of Civil Procedure] sections 437c and 1008 limit the parties' ability to file repetitive motions but do not limit the court's ability, on its own motion, to reconsider its prior interim orders so it may correct its own errors." (*Id.* at p. 1107.) And the court added this: "We cannot prevent a party from communicating the view to a court that it should reconsider a prior ruling (although any such communication should never be ex parte). We agree that it should not matter whether the 'judge has an unprovoked flash of understanding in the middle of the night' [citation] or acts in response to a party's suggestion. If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief." (*Id.* at p. 1108.) The Supreme Court even added this practical tip for counsel: "nothing would prevent the losing party from asking the court at a status conference to reconsider a ruling." (*Ibid.*; accord, *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 73 [103 Cal.Rptr.3d 906].)[8]

---

[8] As indicated, Transport's opening brief referred to its reply in support of its new trial motion, which contained an argument that Judge Woolard's ruling was "law of the case." TIG took issue with this, and Transport's reply brief concedes that law of the case could not pertain,

Here, as quoted above, Judge Woolard herself said that she "wonder[ed] if I misspoke in my writing of these orders." As also noted, counsel for Transport said nothing in response, which is perhaps not surprising, as Transport was pushing strongly for the instruction.

In its reply brief Transport cites to some invited error cases that refer to the doctrine as one involving a decision made for "tactical reasons," with the following authority: "[c]f. *People v. Dunkle* [(2005)] 36 Cal.4th [861,] 924 [32 Cal.Rptr.3d 23, 116 P.3d 494] [' "the invited error doctrine is inapplicable, as it does not appear trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons" ']; *Saxena v. Goffney* [(2008)] 159 Cal.App.4th [316,] 329 [71 Cal.Rptr.3d 469]; *Huffman v. Interstate Brands Corp.* [(2004)] 121 Cal.App.4th [679,] 706 [17 Cal.Rptr.3d 397]; *Pappert v. San Diego Gas & Electric Co.* [(1982)] 137 Cal.App.3d 205, 212, fn. 3 [186 Cal.Rptr. 847].)" A postargument letter cites to the recent case of *Pioneer Construction, Inc. v. Global Investment Corp.* (2011) 202 Cal.App.4th 161.

Putting aside that these cases were first cited in the reply brief, we have two responses. First, and as set forth above, the doctrine is generally described as being based on the concept of estoppel. (See generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 389–391, pp. 447–450.) Second, as is apparent from the lengthy argument described above, Transport fought tooth and nail to keep Judge Woolard from giving TIG's proposed instruction, an instruction that, as described at oral argument, was "worse for Transport." (See fn. 7, *ante*.) Put otherwise, Transport made a strategic reason to vigorously argue for the instruction Judge Woolard gave, especially as there had to be some instruction on the subject—as Transport expressly admits. Specifically: Transport's belated objection to the instruction notwithstanding, its brief admits that it agrees "with the trial court that there must be some alternative event (other than the reinsurer's unconditional denial) to trigger accrual of a cause of action for breach of a reinsurance contract. A contrary rule would lead to the anomalous result that a reinsurer could prevent a reinsured from filing suit simply by refusing to deny a claim. . . . [¶] The question here is not *whether* there must be some alternative trigger (other than the reinsurer's unconditional denial) that gives rise to a right to sue, but *what* that trigger should be." To this admission, we add only the language of Civil Code section 1657: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed." (See also *Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 381 [11 Cal.Rptr.2d 524] [what constitutes " 'reasonable time' " for performance is question of fact determined by circumstances of each case].)

as the doctrine "has no application in trial court proceedings without an appellate decision. (*People v. Barragan* (2004) 32 Cal.4th 236, 246 [9 Cal.Rptr.3d 76, 83 P.3d 480].)"

The second part of Transport's first argument is that the instruction was erroneous because it did not contain reference to equitable tolling. We disagree.

It is probably enough to note that the argument fails because of the invited error doctrine as, to the extent the instruction is claimed to be incomplete, it was agreed to by Transport. The argument also fails because Transport did not request any instruction on equitable tolling.

The well-settled law was confirmed in *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131 [72 Cal.Rptr.3d 382, 176 P.3d 654] (*Metcalf*): " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950–951 [160 Cal.Rptr. 141, 603 P.2d 58].) Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.' (*Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701–702 [200 Cal.Rptr. 870, 677 P.2d 1147].)" TIG's respondent's brief relies heavily on *Metcalf*, citing it three times. Transport's reply brief does not even mention it.

*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534–1535 [254 Cal.Rptr. 492] is similar, with even stronger language, quoting some of the same cases as *Metcalf*, and also Witkin: " 'In order to complain of failure to instruct on a particular issue the aggrieved party must request the *specific proper instruction*.' (7 Witkin, Cal. Procedure, . . . *supra*, Trial, [§ 260, p. 313,] original italics.)" (*Id.* at p. 1535.) And, the court went on, the "[appellants'] theory of review would allow a party to withhold a theory from the jury, by failing to request instructions, and then to obtain appellate review of the evidence and reversal of the judgment on a theory never tendered (or tendered in a different form) to the jury. This process could require a new trial [citations] even though the original trial judge and jury did their respective duties without error. That result would also violate the strong rule of policy that parties to civil lawsuits 'ought not have two trials where they could have had but one.' " (*Null, supra*, 206 Cal.App.3d at p. 1535.) *Null* is also relied on by TIG, twice. Again, Transport's reply brief does not even mention it or cite any relevant cases. (See, e.g., *Ornales v. Wigger* (1950) 35 Cal.2d 474, 479 [218 P.2d 531] ["trial court need not of its own motion give special instructions in the absence of a request therefor by counsel"]; *Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 162 [86 Cal.Rptr.3d 666] [Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) cases are civil proceedings, and trial judge has no duty to issue instructions sua sponte in accord with parties' theories].)

The most Transport can say is this: "Here, the trial court's complete failure to instruct on the tolling issue—even though Transport had previously cited (and extensively quoted) the *Prudential* and *Forman* cases to that same judge (AA 168-178, 244-248)—is unquestionably prejudicial on the facts of this case." But as those citations reveal, Transport cited the cases only in its summary adjudication papers. It never proposed a jury instruction based on equitable tolling—or one even mentioning *Prudential*.

Transport's claimed justification for not requesting such an instruction is "that the trial court had already ruled against Transport on this issue and it would have been futile—and might have aggravated the trial court—to request such an instruction. This is not the kind of 'strategic' decision that invites error." Or, as Transport puts it at another point: "having *lost* at the summary adjudication motions on the legal issue of whether the trial court would apply *Prudential* equitable tolling to this case [citation], Transport was *not* required to offer an instruction on that issue—in direct contravention of the trial court's ruling—in order to preserve the issue for appeal. [Citation.]"

■ Transport's contention that Judge Woolard "ruled against Transport" that equitable tolling did not apply is not shown by the record here, certainly not by pointing to the mere nonmention of it in Judge Woolard's orders denying the motions. All that is needed in an order denying a motion for summary judgment or adjudication is (1) specification of one or more material facts in controversy and (2) specific reference to the conflicting evidence indicating that such triable issue exists. (Code Civ. Proc., § 437c, subd. (g); see *Tera Pharmaceuticals, Inc. v. Superior Court* (1985) 170 Cal.App.3d 530, 532 [215 Cal.Rptr. 923].) And, of course, an order denying the motion simply establishes the existence of a triable issue of fact. It does not decide the issue. (See, e.g., *FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1283 [95 Cal.Rptr.3d 307].)

■ Transport's claimed justification for its failure to request an instruction on equitable tolling also ignores the rule that oral remarks or comments made by a trial court may not be used to attack a subsequently entered order or judgment. (*Farwell v. Sunset Mesa Property Owners Assn., Inc.* (2008) 163 Cal.App.4th 1545, 1552–1553 [78 Cal.Rptr.3d 666]; *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 667 [107 Cal.Rptr.2d 682]; *City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 54 [101 Cal.Rptr.2d 859].) This is one application of the principle that it is what the lower court did—as opposed to what it said—that an appellate court reviews. "[I]t is well settled that it is judicial action and not judicial reasoning or argument which is the subject of review [citation] and oral opinions or statements of the court may not be considered to reverse or impeach the final decision of the court which is conclusively merged in its findings and judgment." (*Selfridge v.*

*Carnation Co.* (1962) 200 Cal.App.2d 245, 249 [19 Cal.Rptr. 310]; accord, *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [125 Cal.Rptr.2d 277].)

Transport asserts that "[a] trial court has a duty to instruct on the *tolling* of the statute of limitations (in addition to accrual) in an appropriate case"— apparently, though Transport does not say this, sua sponte. None of the four cases cited by Transport supports the contention. *Migliore v. Mid-Century Ins. Co.* (2002) 97 Cal.App.4th 592, 604 [118 Cal.Rptr.2d 548], the primary case Transport cites, states only that a tolling instruction was given; it does not establish a rule that a court has a sua sponte duty to propose an instruction not requested by the parties. The three other cases cited—*Baker v. Beech Aircraft Corp.* (1979) 96 Cal.App.3d 321, 327 [157 Cal.Rptr. 779]; *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 129 [125 Cal.Rptr. 59]; and *Hsu v. Mt. Zion Hospital* (1968) 259 Cal.App.2d 562, 575 [66 Cal.Rptr. 659]—are similar, merely referring to the fact that an instruction was given. Nothing in any of them supports the claim that the court must give the instruction on its own.

### Transport's Losing Motions Cannot Succeed Here

Transport's second argument is that "because Transport's lawsuits were timely as a matter of law, the trial court erred by denying Transport's motions for summary adjudication on the statute of limitations defense." The argument fails.

To begin with, there is a real question whether Transport can even make the argument here, with some authority, including *Sierra Craft, Inc. v. Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252 [75 Cal.Rptr.2d 681], a case cited by Transport, holding it cannot. The order there was an order denying summary judgment, and the court held that "[Code of Civil Procedure s]ection 904.1 specifies those orders and judgments of the superior court from which an appeal may be taken. An order denying summary judgment is not one of these. Section 437c, subdivision [(m)(1)] specifies that the judgment resulting from the granting of a motion for summary judgment is appealable, as is any other judgment. However, the same subdivision provides that the denial of such a motion may only be reviewed by way of a petition for extraordinary writ." (64 Cal.App.4th at p. 1256, italics omitted.)

The leading practical treatise states the rule this way: "An order denying summary judgment or granting or denying summary adjudication is reviewable only by a petition for writ of mandamus. [CCP § 437c(m); [citations]] [¶] There is generally no basis for appeal after trial; erroneous denial of summary judgment is generally harmless error after a full trial covering the

same issues. [Citation.]." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶ 10:385, p. 10-149 (rev. # 1, 2011).)[9]

Transport's argument also runs afoul of the general rule that denial of their motions may not be challenged here because the parties litigated the same issues at trial. (See *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 688 [56 Cal.Rptr.3d 92]; *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 [16 Cal.Rptr.2d 38].) The reason is usually explained this way: " 'A decision based on less evidence (i.e., the evidence presented on the summary judgment motion) should not prevail over a decision based on more evidence (i.e., the evidence presented at trial).' " (*Gackstetter v. Frawley, supra*, 135 Cal.App.4th at p. 1269, quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:168.10, p. 8-132.2 (rev. # 1, 2011).)

Transport attempts to get around these problems by urging that the principles do not pertain if the trial court applied the wrong law in denying the motions, citing four cases: *Lackner v. LaCroix* (1979) 25 Cal.3d 747 [159 Cal.Rptr. 693, 602 P.2d 393]; *Gackstetter v. Frawley, supra*, 135 Cal.App.4th 1257; *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1082, fn. 2 [1 Cal.Rptr.2d 215]; and *Aas v. Avemco Ins. Co.* (1976) 55 Cal.App.3d 312, 323 [127 Cal.Rptr. 192]. While *Lackner* does contain the language on which Transport relies—"An order denying partial summary judgment is a nonappealable order although reviewable on appeal from the final judgment"—the Supreme Court went on to say that it "need not reach the . . . issue." (*Lackner v. LaCroix, supra*, at p. 753). As best we can tell, *Gackstetter* and *Aas* did not involve a trial of the issue raised on summary judgment. And *Coy* expressly noted that plaintiff did not contest the defendant's ability to challenge the pretrial summary judgment ruling on appeal after trial. (*Coy v. County of Los Angeles, supra*, 235 Cal.App.3d at p. 1082, fn. 2.)

But even if Transport's argument were not barred procedurally, it would fail on the merits.

Embellishing on its argument, Transport asserts that Judge Woolard "was required to grant summary adjudication in Transport's favor if there were no triable issues of material fact as to the statute of limitations defense and Transport was entitled to judgment on that defense as a matter of law." And,

---

[9] The treatise goes on to note that "review on appeal from the final judgment has been allowed in exceptional cases," citing *Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1269 [38 Cal.Rptr.3d 333]. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 10:385, pp. 10-149 to 10-150 (rev. # 1, 2011).) *Gackstetter* is one of the cases Transport relies on here.

Transport goes on, "had the trial court applied the *correct* accrual and tolling rules in deciding Transport's motions for summary adjudication, the court would have necessarily determined that Transport's suits were timely as a matter of law."

■ Assuming without deciding that tolling even applies here,[10] we are hard pressed to think of more fact-specific issues than "accrual" and "tolling." Indeed, Transport expressly admits as much where, in connection with its reply argument on tolling, it says that "whether that law . . . supports a finding of equitable tolling under the circumstances of this case is a question of fact for the jury (or trial court) to decide on remand. (*Marcario v. County of Orange* (2007) 155 Cal.App.4th 397, 408–409 [65 Cal.Rptr.3d 903] [' "Equitable tolling is a fact intensive issue and it is determined based upon evidence." '].)" That, of course, is the law. (See *Gonzalez v. Kalu* (2006) 140 Cal.App.4th 21, 32–33 [43 Cal.Rptr.3d 866]; *Snow v. A. H. Robins Co.* (1985) 165 Cal.App.3d 120, 128 [211 Cal.Rptr. 271].) The same is true of accrual, which is also a question of fact. "There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. [Citation.] It is a question for the trier of fact." (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597 [83 Cal.Rptr. 418, 463 P.2d 770]; accord, *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1320 [64 Cal.Rptr.3d 9], quoting *Bastian v. County of San Luis Obispo* (1988) 199 Cal.App.3d 520, 527 [245 Cal.Rptr. 78].)

### Refusal of the Estoppel Instruction Was Not Error, Let Alone Reversible Error

Transport's last argument is that the trial court prejudicially erred by rejecting its equitable estoppel instruction. The argument is brief, barely over three pages, a significant portion of which is devoted to quotation of the proposed instruction. Transport's reply brief devotes only three pages as well, this out of its 180 pages.

A party is entitled to "correct" instructions on "every theory of the case advanced by [it] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607,

---

[10] This may be problematic, in light of the lengthy statute of limitations involved. (See *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 380 [2 Cal.Rptr.3d 655, 73 P.3d 517] ["Because plaintiffs had *three* or *four* years *after discovery*, and up to *ten* years after the project's completion, to bring their suits for latent construction defects, many of the concerns that might warrant equitable tolling are ameliorated."]. Cf. *Flintkote v. General Accident Assurance Co. of Canada* (N.D.Cal. 2007) 480 F.Supp.2d 1167, 1179–1180 [holding equitable tolling could apply to four-year statute of limitations in asbestos case].)

882 P.2d 298].) Here, and unlike its conduct in connection with its claim of instructional error in connection with equitable tolling, Transport did propose an instruction on equitable estoppel. TIG and Seaton opposed it, and Judge Woolard rejected it, ruling that "based on the research [she] did in chambers," no evidence supported it. We agree with that. But even before that, Transport did not advance the theory.

The general rule is that estoppel must be specifically "pleaded in the complaint with sufficient accuracy to disclose [the] facts relied upon." (*Chalmers v. County of Los Angeles* (1985) 175 Cal.App.3d 461, 467 [221 Cal.Rptr. 19]; see *Central National Ins. Co. v. California Ins. Guarantee Assn.* (1985) 165 Cal.App.3d 453, 460 [211 Cal.Rptr. 435] [equitable estoppel "must be pleaded, either as a part of the cause of action or as a defense"]; *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 641 [134 Cal.Rptr.2d 273].) Transport's complaints did not plead any facts as to estoppel or identify any statement of fact made by either of the reinsurers that Transport reasonably relied upon to its detriment. Not only did Transport not plead equitable estoppel, it did not assert it in opposition to the motions for summary judgment. Or even mention it in its trial brief. The theory was not advanced. Nor supported.

■ "A valid claim of equitable estoppel consists of the following elements: (a) a representation or concealment of material facts (b) made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually and permissibly, of the truth (d) with the intention, actual or virtual, that the ignorant party act on it, and (e) that party was induced to act on it." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 191, pp. 527–528; see *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1165–1166 [10 Cal.Rptr.3d 582].) And "[t]he defendant's statement or conduct must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." (*Lantzy v. Centex Homes, supra,* 31 Cal.4th at p. 384, fn. 18.) Transport's evidence did not measure up.

As to Seaton, Transport argues that its willingness to receive information "strongly suggested [Seaton] did not believe Transport's claims were (or were about to be) barred by the statute of limitations, and Transport reasonably relied on the message this conduct conveyed by not filing suit earlier." Transport cites no evidence that it reasonably relied on this willingness in delaying this action, with its only record references to its counsel's arguments.

As to TIG, Transport asserts that it "pressed Transport to delay filing suit." The evidence cited is less than compelling. What is compelling is the

evidence from Thomas Newman, one of Transport's attorneys, who testified it was Transport which asked TIG not to file suit, and that Transport agreed it would hold off on filing suit against TIG as long as it agreed not to "file a pre-emptive action against Transport."

Moreover, and as indicated above, Transport's lawyers had advised it that the statute of limitations might be a factor, a fact that militates against a claim of estoppel. (See *Mills v. Forestex Co., supra*, 108 Cal.App.4th at p. 655.)

Transport's brief argument does cite, without discussion, to 192 pages in its appellant's appendix and 34 trial exhibits. While Transport's reference does not explain why the correspondence helps it, some of the correspondence demonstrably cannot. Thus, for example, several of the letters to which Transport refers are letters reaffirming TIG's position that it would not pay on the proofs of loss before it. Such denials cannot create an estoppel. (*Lantzy v. Centex Homes, supra*, 31 Cal.4th 363, 384, fn. 18.) In sum, Transport points to no evidence that it reasonably relied on conduct of either reinsurer in deciding not to sue.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied February 2, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 28, 2012, S200113.