Filed 3/28/13  Weissberg v. Weissberg CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANITA WEISSBERG, <br><br> Petitioner and Respondent, <br><br> v. <br><br> LAWRENCE WEISSBERG et al., <br><br> Respondents and Appellants. | A132161 <br><br> (San Francisco City & County <br> Super. Ct. No. FMS-10-386009) |

Husband and wife, a wealthy couple, were married for nearly 20 years when the husband developed dementia.  The husband's adult sons became involved handling his financial affairs, and began to eliminate or reduce some of the payments husband had made to or for the wife.  Although the marriage remained intact, the wife filed a petition against her husband (later joining the sons, the trustees of his trust), seeking greater payouts to allow her to maintain the standard of living she had been afforded before her husband's illness.  The parties settled their differences as to the underlying issues of support, but they disagreed about whether the trust may be ordered to pay her attorney fees.  The trial court ruled that it could be required to do so.

Husband, the trust, and the trustees (when referred to collectively, appellants) appeal, an appeal that involves only the dispute about attorney fees.  To resolve that appeal, however, we are asked to examine fundamental issues of privacy within a marriage, to determine what is required to assert a claim for spousal support under

1

Family Code sections 4300 and 4303,[1] and to answer what appellants claim is a question of first impression:  whether the courts may be used at all to compel payment of support for an ongoing standard of living in an intact marriage.  We answer that question, as well as all other questions, in favor of the wife.  We therefore affirm the order awarding her attorney fees.

## BACKGROUND

**Appellants' Opening Brief**

Judging by appellants' dramatic opening brief one might mistake this case for one of surpassing importance on the limits of state power to intrude into the affairs of its citizens, and specifically its married citizens.  The brief opens this way:

"The State promulgates laws to regulate the formation of a marriage, the validity of a marriage, and the termination of a marriage.  The State has no interest in the marriage once it has been established and so long as it remains intact, expressing this lack of interest as an inviolate right of privacy enshrined in Article 1, section 1 of the California Constitution.

"The only permissible intrusion by the state into the ongoing marriage is one that is compelled by the State's interests manifest as a concern for the State, for example, such as the protection of the 'public purse' (e.g., Fam. Code §§ 4300 and 4303, Pen. Code § 270a) or an offense to the state, for example, such as inter-spousal violence. (e.g. Pen. Code §§ 273.8 - 273.88.)

"The State takes no interest in the internal and intimate marital affairs of its citizens absent an interest by the State to offset the codified Right of Privacy.  That respect given to the privacy of the intimate, ongoing marital relationship is further amplified and implemented through the sanctity of communications between spouses known as the Marital Communication Privilege. (Evid. Code § 980.)

---

[1] Undesignated statutory references are to the Family Code.

"The State of California has no interest in whether or not Anita Weissberg receives more than $37,737 tax-free dollars each month plus the use and enjoyment of a residence in Pacific Heights and a condominium in the Trump Palace in New York City.

"Appellant will demonstrate that there is no authority, statutory or decisional, giving the Court the right, under the facts of this case, to pierce the Constitutional privacy rights asserted by Appellant Lawrence Weissberg and thereby violate the public policy of this State.

"A holding that Family Code section 4300 authorizes this gratuitous action for more money by a woman who never alleged a violation of the duty of support, never alleged any abandonment or refusal of shelter or necessaries, never alleged any risk to the 'public purse,' had free and unfettered enjoyment of her two marital homes and enjoyed payments worth $37,737 tax-free per month, would establish a terrible precedent. Such a holding would open the courts to any spouse who is unhappy with the private financial arrangements within an ongoing marriage. Any such spouse could ask the Court to insert itself into explicitly protected financial affairs as the third and dominant party to potentially every ongoing, intact marriage in this State."

We think the case is much less sweeping in its implications, and we fail to see a holding adverse to appellants as a threat to the institution of marriage, as appellants would have it.

**The Facts**

In September 1982, Lawrence Weissberg, then age 61, married Anita Weissberg, then age 41. Lawrence, president and chairman of the board of Dover Investments Corporation (Dover), had a successful career in which he had acquired a good deal of wealth through real estate development, stock market investments, and the savings and loan industry.[2] Both Lawrence and Anita had adult children, and Lawrence's children, Frederick and William. would become significant players here when, years later, they

---

[2] As is typical in family law cases, we refer to the parties by their first names. No disrespect is intended.

3

took control of their father's financial affairs and began acting vis-à-vis Anita in a manner inconsistent with the past.

Lawrence and Anita entered a prenuptial agreement in August 1982 that provided there would be no community property of the marriage. Lawrence's wealth at the time of the marriage was estimated at more than $17 million and he had income of approximately $225,000 to $400,000 per year.

As Lawrence was growing older, he wanted to enjoy life and to have Anita spend all of her time with him. At his request Anita quit her job after six months of marriage and abandoned her career to be his full-time wife and companion. The couple enjoyed a sumptuous lifestyle, dividing their time between Lawrence's home in Pacific Heights in San Francisco and his condominium in the Trump Palace on the upper East Side of Manhattan.[3] They traveled abroad frequently, dined in fine restaurants, attended the symphony, theater, and opera, entertained lavishly, and participated in charitable functions. While all of the assets may have been Lawrence's separate property, he appears to have been unstinting in providing Anita with a standard of living appropriate to his means. And in addition to paying for the lifestyle they enjoyed together, Lawrence allowed Anita to use his credit card freely.

By 2000, however, Anita had begun to feel financially vulnerable. Lawrence was almost 80 years old, and Anita had little in the way of assets and was not accumulating assets in spite of their long marriage. To remedy the situation, Lawrence determined to give Anita $2 million and $15,000 per month to provide her with some financial security. The monthly allotment was not intended to provide Anita with her sole means of support, but was intended to allow her to build up some assets of her own.[4] In fact, Lawrence continued to spend lavishly of his own assets to sustain their lifestyle.

---

[3] The condominium is sometimes referred to in the record as being in the Trump Tower and sometimes in the Trump Palace. That we use Trump Palace has no bearing on the outcome of the case.

[4] The facts in this paragraph are taken from a declaration filed by Anita on August 3, 2010. Appellants objected to specific statements in the declaration on grounds

4

On May 6, 2000, Lawrence signed an agreement in which he promised to give Anita $15,000 per month during his lifetime. He further promised to give her, upon his death, his residence in San Francisco, his condominium in the Trump Palace, and resources for the upkeep of both. In addition, upon his death Anita was to receive control over the assets that generated the $15,000 per month, approximately $3.2 million. In exchange, Lawrence was relieved of all financial responsibility for Anita's two adult daughters.

Three days later Lawrence signed another agreement, promising to give Anita stocks and/or securities worth $2 million. The agreement recited that $498,740 had already been given to Anita and $1,501,260 was due and owing.

One year later, on May 9, 2001, Lawrence and Anita signed an amendment to the prenuptial agreement that was evidently intended to replace the agreements entered May 6 and May 9, 2000. In addition to giving Anita $15,000 per month during his lifetime, Lawrence promised upon his death to give Anita: a charitable remainder annuity trust in the amount of $6.2 million, the Pacific Heights residence, the Trump Palace condominium, and $1,040,000 (which was, in light of additional transfers, the revised amount due under the May 9, 2000 agreement.)

Also on May 9, 2001, Lawrence amended his own living trust, the Lawrence Weissberg Revocable Living Trust (LWT), which he had established in 1992. The amendment made the LWT consistent with the amendment to the prenuptial agreement

---

they violated Lawrence's individual and marital privacy rights under Article I, section 1 of the California Constitution and violated the marital communication privilege (Evid. Code, § 980). The court below ruled the material was irrelevant to the issue before it, but otherwise withheld ruling on those objections. Since the merits of the support request never came before the court for determination, the objections were never ruled upon.

We overrule Lawrence's objections insofar as the declaration has any bearing on our decision. Evidence Code section 980 does not apply in proceedings between spouses. (Evid. Code, § 984 ["There is no privilege under this article in: (a) A proceeding brought by or on behalf of one spouse against the other spouse"]; § 3551 [see fn. 13, *post*]; *Manela v. Superior Court* (2009) 177 Cal.App.4th 1139, 1147.) We shall address the privacy issues as necessary in the discussion section of this opinion.

with respect to provisions for Anita. On the same date Lawrence established the Lawrence Weissberg Irrevocable Real Property Trust, which provided that Anita would receive the Pacific Heights home and the Trump Palace condominium if she survived him by at least 30 days.

Lawrence went downhill mentally over a period of time but took a "decided turn for the worse" in August 2001. In October 2001, he surrendered legal control over the LWT, and in December he resigned his position with Dover and his salary ceased. Lawrence is now 92 years old, and the parties agree he is incompetent.

Lawrence had appointed his son Frederick as attorney in fact in May 2000, and Frederick became one of the trustees of the LWT in October 2001, when Lawrence surrendered legal control.[5] Anita claims that once Frederick took control of his father's wealth, he became increasingly resistant to providing Anita with the funds required to maintain the lifestyle she had enjoyed when Lawrence was in good health. And she began to pay for some of her own expenses, though the LWT continued to pay for most of the shared household expenses during this period.

In 2005, Anita approached the LWT about receiving the $1,040,000 she was due at Lawrence's death. Anita and the trustees entered into an agreement in June 2005 called the "Agreement for Advance Distributive Share of the Lawrence Weissberg Revocable Trust" (Advance Agreement), and the LWT agreed to pay to Anita $1,040,000 early, which it did in June 2005. Anita executed a release of the LWT and trustees from any additional claims. The trustees say they would not have signed the Advance Agreement without the release.

Though Lawrence required in-home care beginning in 2002 (and eventually round-the-clock care), he and Anita continued to live together in the Pacific Heights home until June 2008, when he was moved to a facility specializing in dementia care. According to Anita, after Lawrence was moved to that facility, Frederick and William, as

---

[5] The trustees of the LWT are currently Lawrence's sons Frederick and William, as well as an independent trustee, Erika Kleczek.

6

co-trustees, further dramatically reduced the amount spent on Anita's needs. And in August 2008 she consulted a probate lawyer for advice regarding Lawrence's estate plan and her ongoing dealings with the LWT.

On October 14, 2008, four months after Lawrence moved out of the marital home, the attorney for the LWT sent Anita a letter stating that the trustees had decided to adjust the expenses previously covered by the LWT. From that point forward, the LWT would pay Anita $15,000 per month, for general household expenses, and for cosmetic improvements to the two properties on a case-by-case basis. The LWT would not, however, pay for her personal expenses, and eventually stopped paying for Anita's cell phone, groceries, household supplies, vitamins, body care items, nonprescription drugs, gasoline, car insurance, travel, entertainment, and charitable contributions. Lawrence's credit card was also canceled, making his credit unavailable to Anita.[6]

Anita continued in the full enjoyment of the two homes and was receiving $15,000 in cash per month from the LWT. But, she claimed, the amount provided was insufficient to allow her to maintain her marital lifestyle and to continue to move in her preexisting social circles, and Anita continued using her own funds to pay expenses. This led to increasing insecurity as Anita watched her assets dwindle. And to the petition here.

**The Proceedings Below**

On April 19, 2010, Anita filed a petition pursuant to sections 4300 and 4303 naming Lawrence as the defendant to enforce his duty of support during marriage. She sought an order setting a "reasonable sum" for support, sufficient to meet her needs and to "return her to the marital standard." Over Anita's objection, Frederick was appointed guardian ad litem for Lawrence and filed a response to the petition on Lawrence's behalf.

---

[6] The LWT initially refused to pay for Anita's rehabilitative therapy following invasive back surgery, but ultimately agreed to pay for that expense.

Anita's own net worth was approximately $370,000 at the time she filed her petition; Lawrence's was alleged to be approximately $27 million, but may have been closer to $44 million. In light of the disparity in wealth, Anita also sought attorney fees and costs, as well as forensic accountant's fees. In June 2010, Nordin Blacker, Anita's lawyer in the family law case, asked the trustees to advance $100,000 for her attorney fees. He also requested that Anita's monthly allowance be increased by $10,000 per month. On June 17, 2010, the trustees advanced checks to Blacker for $100,000 and to Anita for $50,000, which represented an increase of $10,000 for the five preceding months.

Anita moved to join the LWT and its trustees as parties to the action. The trustees opposed joinder on grounds that Anita's action was not authorized under sections 4300 and 4303 because it would violate the parties' privacy rights. Lawrence also filed a notice asserting his privacy and due process rights and the marital communications privilege under Evidence Code section 980.

A hearing on joinder was held on September 14, 2010. The court ruled Anita's declaration was irrelevant to the joinder motion, but otherwise reserved jurisdiction to rule on appellants' objections. (See fn. 4, *ante*.) There was no ruling on any issue relating to the validity of the underlying action, including on appellants' claims of privacy, due process, or the marital communication privilege. By written order dated October 27, 2010, the LWT and the Trustees were joined in the action.

During the September 14 hearing the court also said that it did not want the LWT to be treated as "an unlimited fund for litigation" because the Trustees had a fiduciary duty to Lawrence, Anita, and the Lawrence Weissberg Foundation (Foundation).[7] The court encouraged the parties to work toward a settlement, and they subsequently began settlement negotiations. Meanwhile, in October 2010 the LWT voluntarily advanced

---

[7] The Foundation is a nonprofit corporation for public and charitable purposes that Lawrence established in 1986. It is the residual beneficiary of his estate.

8

another $100,000 to Anita for her professional fees and continued to pay her $25,000 per month.

The parties reached a settlement, and on December 15, 2010, the following terms were put on the record: (1) Anita would receive a tax-free, non-modifiable allowance from the LWT of $55,000 per month continuing until the earlier of her death, Lawrence's death, or her remarriage; (2) Anita would receive clear title to the Pacific Heights and Trump Palace properties; and (3)Anita would be given access to a $100,000 reserve fund in the event of a future emergency. The settlement was later entered as a stipulated judgment.

On January 10, 2011, Anita filed a memorandum of points and authorities in support of her request for fees and costs, along with her own income and expense declaration and declarations by her attorney and accountant to substantiate the fees. Her total fees and costs were $791,696. Appellants filed opposition.

By court order entered March 25, 2011, the trial court resolved the matter, which order begins with the following recital: "Following a full settlement on all issues raised by petitioner wife's request for support in an intact marriage, the court took under submission wife's request for attorney fees and costs. Further pleadings were directed by the court and the matter was submitted on January 27, 2011. Because minor disagreements regarding the settlement language delayed the entry of the Stipulated Judgment, this court determined not to issue the fees order until after the Judgment and Stipulation were filed and entered with this court, which occurred on March 18, 2011. The Court now issues its Findings and Orders regarding fees and costs under Family Code section 2030 et seq."

Following that recital, the order went on as follows: "Under the reasoning of [*Kilroy v. Kilroy*] (1995) 35 Cal.App.4th 1141 [(*Kilroy*)], and those cases to which it cites [citations omitted] this court has equitable power, 'in an authorized action or proceeding for support, to grant pendent lite support and *litigation expenses* without statutory authorization in so many words.' (emphasis added) (*Kilroy, supra,* at p. 1146.)

9

"Although Husband and the Trust contested that this court has authority to make support orders in an intact marriage under Family Code section 4301 and 4303, they waived the objection and granted the court authority by agreement inherent in their settlement of the petition to enforce the support obligation."

There followed three pages of findings of fact supporting the court's conclusion, which awarded Anita $689,223 in fees and costs, the calculation of which will be discussed more fully below. The order credited the LWT for the $200,000 already advanced and ordered the remaining $489,223 payable "forthwith."

Appellants filed a timely notice of appeal.

## DISCUSSION

### I. **Introduction**

The sole issue on appeal is the validity of the court's award of attorney fees and other professional fees. Appellants contend the award cannot stand because (1) the action brought under section 4303 was not authorized in the first place; (2) the finding of waiver is not supported; and (3) the amount of the award was excessive.

The thrust of appellants' fundamental argument is that Anita was entitled to have her attorney fees paid by the LWT only if her action was "authorized" under sections 4300 and 4303. (*Kilroy*, *supra*, 35 Cal.App.4th at p. 1146.) And Anita's action, they posit, was not authorized because (a) section 4300 is intended to require a spouse only to provide his or her spouse with "the necessaries of life" and Anita was not being deprived of any necessities; (b) an action by one spouse against another during an intact marriage may be brought only if the health or basic welfare of the petitioning spouse is in jeopardy; and (c) an action for support may only be brought under section 4303 in a case where the husband and wife are separated or divorced.

The rule is that an objection to subject matter jurisdiction may never be waived. (*Keithley v. Civil Service Bd.* (1970) 11 Cal.App.3d 443, 448 [subject matter jurisdiction may not "be conferred by consent, waiver or estoppel" and "an objection to subject matter jurisdiction may be raised for the first time on appeal"].) While appellants do not in so many words appear to be challenging subject matter jurisdiction, they

10

fundamentally contend that on the specific facts of this case Anita's claim was not authorized, and thus for policy or prudential reasons the courts should decline to entertain petitions comparable to Anita's. We thus begin with appellants' fundamental claim.

## II. Sections 4300 and 4303 Authorized Anita's Petition

### A. The Statutes

"The Legislature's chosen language is the most reliable indicator of its intent because ' "it is the language of the statute itself that has successfully braved the legislative gauntlet." ' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) Section 4300 provides in full as follows: "Subject to this division, a person shall support the person's spouse." Section 4303, insofar as it deals with suits by one spouse against the other, provides that: "(a) The obligee spouse, or the county on behalf of the obligee spouse, may bring an action against the obligor spouse to enforce the duty of support."[8] Section 4320, set out in the margin,[9] lists the

---

[8] The statute continues: "(b) If the county furnishes support to a spouse, the county has the same right as the spouse to whom the support was furnished to secure reimbursement and obtain continuing support. The right of the county to reimbursement is subject to any limitation otherwise imposed by the law of this state.

"(c) The court may order the obligor to pay the county reasonable attorney's fees and court costs in a proceeding brought by the county under this section." Subdivisions (b) and (c) apply only where the county is a party to the action.

[9] Section 4320 provides: "In ordering spousal support under this part, the court shall consider all of the following circumstances:

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:

(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.

circumstances that should be considered in "ordering spousal support under this part." The reference to "this part" quite clearly is to Part 3 (Spousal Support) of Division 9 (Support) of the Family Code, where sections 4300 and 4303 are both contained. Sections 4300, 4303 and 4320 all were enacted by 1992 Stats. ch. 162, § 10.[10] And, of

_____

"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets, including the separate property, of each party.

"(f) The duration of the marriage.

"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h) The age and health of the parties.

"(i) Documented evidence of any history of domestic violence, as defined in Section 6211, between the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.

"(l) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.

"(m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4325.

"(n) Any other factors the court determines are just and equitable."

[10] Despite the rather clear language and organization of the statutes, appellants contend that section 4320 does not apply to support orders in an intact marriage, going so

12

course, addressing the question as a matter of statutory interpretation, we apply a de novo standard of review. (*In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201; *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1479.)

The issue raised by appellants—one which consumes much of their voluminous briefing—is that attorney fees may not be awarded at all because Anita's petition was not "authorized" under sections 4300 and 4303. Appellants argue vigorously that this is an issue of first impression because no other reported case involves a suit by one spouse against another in an intact marriage where the suing spouse is being supported with basic necessities even though the level of support falls short of that provided during the earlier history of the marriage. In particular, appellants argue that section 4320, subdivision (d)—which includes as a reference point the "standard of living established during the marriage"—may not be applied to an intact marriage, evidently of the view that separated or divorced spouses are entitled to continue being supported at the marital standard, but spouses in an ongoing, intact marriage are not.[11] We cannot wring such a meaning from the statutes. And any public policy supporting such a position is hard to discern.

Appellants insist we must look to the legislative history of section 4303 and must place limits on who may bring an action under that section, even though no such restrictions appear in the statutory language itself. Appellants lead us through a lengthy discussion of the historical development of sections 4300 and 4303, and claim there are

_____

far as to call any analysis resting on the grouping of the sections within the same division and part "specious and unsubstantiated." On the contrary, we find such analysis compelling. (See, e.g., *Fig Garden Park No. 2 Ass'n. v. Local Agency Formation Com.* (1984) 162 Cal.App.3d 336, 342 ["Canons of statutory construction require that a statute be interpreted in harmony with the act of which it is a part"].)

[11] We have previously held, in a dissolution action, that the marital standard of living is neither a " 'floor' " nor a " 'ceiling' " for spousal support but " 'merely a "basis" or reference point for determining need and support.' " (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 565.) Nothing we say today should be read as contradicting that holding.

policy reasons, not apparent on the face of the statutes, for limiting the scope of the sections. And they present claimed policy arguments as to why a spouse in an intact marriage should not be permitted to sue the other spouse for support except in dire circumstances, specifically, where the suing spouse has been abandoned without support or given such meager support that he or she has fallen onto, or at least threatens to fall onto, the public welfare rolls.[12] Indeed, appellants go so far as to urge it is only to protect the public purse that the law was enacted, and it is primarily the county itself which is authorized to sue.

It is not clear exactly how far appellants would push this argument, but it is possible they would deny a cause of action to anyone in an intact marriage who is receiving from their spouse support in an amount sufficient to keep them off public assistance. We cannot read into the statute such limitations, based solely on the fact that a county, like a spouse, is authorized to enforce the support obligation. And we do not agree that the sole function of sections 4300 and 4303 is to protect the public purse.

The obligation of spousal support was codified in California long before section 4300 was adopted. (See former Civ. Code, § 155, enacted 1872 [same as current Civ. Code, § 720].) Our courts have held there is no single uniform legislative purpose served by spousal support, that its purpose in each case turns on the individual facts. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 312; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480-481.) In this case, its purpose is to protect a

---

[12] Appellants use the penal statutes to define an upper limit on the support that is required under section 4300, whereas it seems clear to us that Penal Code section 270a defines only the minimal support that will keep a spouse out of jail for failure to support the other. It imposes criminal sanctions if a spouse "willfully abandons and leaves his or her spouse in a destitute condition, or who refuses or neglects to provide such spouse with necessary food, clothing, shelter, or medical attendance . . . ." Thus, appellants would have us find that, barring a failure to provide these bare necessities, one spouse may not sue another to enforce the obligation of support during an intact marriage. They claim an action by a spouse in an intact marriage may be maintained under section 4303 only if the public purse is threatened or if "the health or basic welfare of the petitioning spouse" is in jeopardy. (Commentary, Blumberg's Cal. Family Code Ann. (2013), § 4303, p. 344.)

71-year-old, probably unemployable, woman from having to reduce her standard of living due to what appears to be the trustees' unreasonable refusal to maintain her at the marital standard set by her husband, the trustor.

We find no textual support for appellants' claimed limitation in the Family Code sections, and we look no further. Despite appellants' lengthy detour through the historical development of these provisions, we must abide by the rules of statutory interpretation. We need not resort to an examination of legislative history of the statute or other indicia of legislative intent if its meaning is unambiguous. (*S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379.) "If the statutory language is clear and unambiguous, our task is at an end . . . ." (*MacIsaac v. Waste Management Collection & Recycling, Inc., supra*, 134 Cal.App.4th at p. 1083; see also, *In re Marriage of Taschen* (2005) 134 Cal.App.4th 681, 688 [legislative history " 'cannot change the plain meaning of clear language' "].)

Here, the reach of section 4303 is plain: "The obligee spouse . . . may bring an action against the obligor spouse to enforce the duty of support." There is no limiting language to suggest that only abandoned or impoverished spouses may sue. No language to suggest that an action for support may only be filed if the couple is separated. And no language suggesting that violation of the criminal statute for failure to support one's spouse is prerequisite to the spouse's filing a civil action for support.

**B.**     ***Kilroy v. Kilroy***

*Kilroy, supra*, 35 Cal.App.4th at p. 1146, the case relied on by the trial court, involved a situation where no dissolution or legal separation action had been filed. Husband challenged the court's jurisdiction to order temporary support and attorney fees in such circumstances, but apparently did not argue there was no jurisdiction under section 4303 to entertain the action. (*Id*. at p. 1144.) The court "recognize[d] the equitable power of the court, in an *authorized* action or proceeding for support, to grant pendente lite support and litigation expenses without statutory authorization in so many words." (*Ibid.,* italics added.)

15

Appellants argue Anita's action under sections 4300 and 4303 was not "authorized" and *Kilroy* has no application. Appellants point out that *Kilroy* cited only cases in which one spouse had abandoned the other. They ultimately find this not too troubling in *Kilroy* itself, because the wife there alleged the husband had "attempted to deny her access" to their residence (*Kilroy, supra,* 35 Cal.App.4th at p. 1143), and the husband alleged the parties had separated shortly before the action was filed (*id.* at p. 1144). According to appellants, therefore, husband was failing to give any support to his wife, and thus *Kilroy* is distinguishable—indeed, in their words "useless" in deciding the case before us. We disagree with appellants' reading of *Kilroy.*

In *Kilroy,* neither party had filed for dissolution (or apparently legal separation) because of the effect it would have had on the wife's entitlement to property under their prenuptial agreement. (35 Cal.App.4th at p. 1144, fn. 2.) And while the Kilroys were living separately, so were Anita and Lawrence. The only real distinction is that the Kilroys were living separately due to marital discord, while Anita and Lawrence are living separately by force of circumstance. Such is of no legal significance in our view.

Appellants seize upon the Kilroys' living arrangement to suggest that the husband had "abandoned" his wife, and wholly "deprived [her] of support." The inference is unjustified. True, in *Kilroy* the wife alleged that the husband had failed to support her "in accordance with their marital standard of living, '*or at all.*' " (*Kilroy, supra,* 35 Cal.App.4th at p. 1143, italics added.) Maybe that was alleged, but a close examination of the case reveals scant support for the notion that Mrs. Kilroy had been left destitute, and it cannot be reasonably claimed that Mrs. Kilroy's "health or basic welfare" was "in jeopardy" due to lack of shelter. (Commentary, Blumberg's Cal. Family Code Ann., *supra,* foll. Fam. Code § 4303, p. 344.) The couple had "several dwellings" (*Kilroy, supra,* 35 Cal.App.4th at p. 1144), and there was no allegation that the husband had denied the wife access to any of the other homes or that she was left homeless. (*Id.* at p. 1144.) Nor is there reason to believe Mrs. Kilroy had been left wholly without support. Her specific complaints were that her husband had stopped allowing her to use the home for charitable functions (as she apparently had done previously) and had closed

16

her charge accounts and refused to renew insurance on her valuables. (*Id.* at pp. 1143, 1144.) Surely if Mrs. Kilroy had been left destitute she would have had more to complain about than nonrenewal of an insurance policy. There is simply no basis to believe Mrs. Kilroy had been left without clothing or nourishment, in want of medical care, or otherwise in an impoverished state. We seriously doubt Mr. Kilroy's conduct amounted to a violation of Penal Code section 270a, as appellants would evidently like us to infer, and there is no suggestion in the opinion that the wife had been forced to seek public assistance or was in any other manner a threat to the public purse. In sum, we see *Kilroy* as being closely parallel—not "useless."

There is no escaping the fact that *Kilroy* expressly determined that attorney fees may be ordered in actions brought under section 4303, which is precisely the issue before us. Given the undisputed evidence that Lawrence, while he was competent to do so, fully and liberally complied with what he viewed to be his obligation of support, we cannot conclude that Anita's petition to enforce continuing compliance with the standard he set was "unauthorized" under sections 4300 and 4303. *Kilroy* does nothing to convince us that Anita's action was not "authorized." It does much to persuade us that attorney fees were properly awarded here.

Our conclusion is bolstered by various treatises. For example, while recognizing that the "primary purpose" of section 4303 "is to allow a public entity that has provided public assistance to a married adult to seek reimbursement from the person's spouse," a leading treatise further states that "[t]he person entitled to support may also bring the action, *whether or not the parties have separated.*" (2 Kirkland et al., Cal. Family Law Practice and Procedure (2d ed. 2012) § 50.100, p. 50-14 (italics added).) The same treatise indicates that support may be sought in an action for dissolution, legal separation, or nullity, or it may be "ordered in a proceeding between spouses that does not address the status of the marital relationship." (*Id.,* § 51.02, at p. 51-7; see also, California Child and Spousal Support: Establishing, Modifying, and Enforcing (CEB 2013) § 5.16 [an action under § 4303 "may be brought even if the party seeking support does not wish to terminate an ongoing marriage"]; Hogoboom & King, Cal. Practice Guide: Family Law

17

(2012) § 6:810, p. 6-300; 1 Raye & Pierson, Cal. Civil Practice: Family Law Litigation (2002) § 3:4, p. 12.)

If we needed further support for our conclusion of Anita's right to sue for support, we would find it in a case dating back to the early days of our statehood, in *Galland v. Galland* (1869) 38 Cal. 265, 272 (*Galland*). There, the wife and her infant child had been driven from the marital home by her husband. (*Id*. at p. 266.) The Supreme Court allowed the wife to sue her husband in equity for adequate support without having to file for divorce. Though the majority opinion made reference to the fact that a woman in such circumstances "might starve for lack of the necessaries of life" (*id*. at p. 267), there was no evidence that such was Mrs. Galland's fate, as the husband was voluntarily paying her $77 per month and she wanted $150 per month. (38 Cal. at p. 273 (dis. opn. of Sprague, J).) We will not hazard a guess what standard of living $77 per month would have supported in the 1860's, but it does not strike us as representing the kind of complete lack of support appellants urge is necessary to maintain an action under section 4303.

Appellants cite no authority to support their theory of the limitations on section 4303, save for a Commentary to that section in Blumberg's Annotated California Family Code, which evidently inspired their approach to this appeal. The Commentary—apparently the opinion solely of the editor—reads as follows: "*Kilroy v. Kilroy*, 35 Cal.App.4th 1141, . . . holds that a trial court may award temporary support and attorney's fees in a civil action brought by one spouse to enforce the other spouse's Section 4300 duty of support during marriage. Although neither spouse had brought any action for dissolution, it appears that the spouses were not living together when the wife brought her Section 4303 action. Thus *Kilroy* does not directly challenge the venerable American rule that when the spouses are still living together as husband and wife, the courts will not intervene in an ongoing marriage to order spousal support absent jeopardy to the health or basic welfare of the petitioning spouse." As support for this "venerable American rule," the editor then cites a 1953 Nebraska case, *McGuire v. McGuire* (1953)

157 Neb. 226 [59 N.W.2d 336] (*McGuire*). (Commentary, Blumberg's Cal. Fam. Code Ann., *supra*, p. 344.)

McGuire involved a miserly and domineering husband who refused to use his substantial assets to provide his wife with what most of us would consider ordinary comforts, such as an indoor toilet and a kitchen sink, and he severely restricted her use of the telephone so she could not call her adult children who lived out-of-state. (*McGuire, supra,* 59 N.W.2d at p. 338.) The Nebraska court refused to grant her equitable relief while the marriage remained intact. If she wanted a toilet and a sink she would be forced to file for divorce. (*Id*. at pp. 341-342.) If *McGuire* is evidence of a good rule, let alone a venerable one, it comes in a novel guise.

Returning to the law of California, the obligation of support, besides being covered by section 4300, is provided for under section 720, which defines the mutual obligations of husband and wife during marriage: "Husband and wife contract toward each other obligations of mutual respect, fidelity, and support." Such support is not, as appellants contend, limited to the "necessaries of life."

In *Galland*, the Supreme Court described the obligation of spousal support as follows: "Amongst other rights secured to the wife, is the right to be suitably supported and maintained by the husband, according to his means and station. If he fails or refuses to provide such support for her, the law authorizes her to purchase from others, on the credit of her husband, whatever is necessary for her maintenance and suitable to her station in life." (*Galland, supra,* 38 Cal. at p. 266; see also *Davis v. Davis* (1924) 65 Cal.App. 499, 501 ["[E]very wife is entitled to demand of her husband a support in accordance with his station in life"]; *In re Marriage of Stimel* (1996) 49 Cal.App.4th 991, 994-995, [spousal "support" defined as "all such means of living as would enable one to live in the degree of comfort suitable and becoming to his or her station of life . . . ."].)

We see nothing that would limit a spouse, whether wife or husband, to a claim for items of absolute necessity, and instead think the spouse is entitled to be supported in accordance with the other spouse's station in life. That, we conclude, must be the case here, where the husband previously had generously supported his wife through 20 years

19

of marriage prior to succumbing to dementia and there is no reason to believe his trust could not continue to do so.

**C.     None of appellants' objections or policy arguments calls for a different result**

**1.     Privacy**

Appellants claim that if we were to construe sections 4300 and 4303 as we have done it would violate Lawrence's privacy rights under the state and federal Constitutions. The right of privacy has been enshrined in article I, section 1 of the California Constitution: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." A federal constitutional right of marital privacy has also been recognized in *Griswold v. Connecticut* (1965) 381 U.S. 479, 484-486, as one arising from the "penumbras" of several constitutional guarantees. (*Id*. at p. 484.) We do not question that marital financial matters may fall within the scope of marital privacy. (See *City of Carmel-By-the-Sea v. Young* (1970) 2 Cal.3d 259, 268.) But we do not see these rights as being violated by the type of action contemplated under section 4303.

Whether a party has a legally cognizable privacy interest is a question of law warranting independent review, as is the identification of countervailing interests. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 40 (*Hill*).) The relative strength of those competing interests presents a mixed question of law and fact which, since the material facts are undisputed, may also be reviewed as a matter of law. (*Ibid*.)

Appellants insist that any intrusion into marital privacy must be supported by a "compelling need," citing *People v. Thomas* (1984) 159 Cal.App.3d Supp. 18, 21. To begin with, the reference in *Thomas* to the necessity of a compelling state interest cannot stand after the Supreme Court's analysis in *Hill*, *supra*, 7 Cal.4th at pp. 34-35: "[W]e decline to hold that every assertion of a privacy interest under article I, section 1 must be overcome by a 'compelling interest.' Neither the language nor history of the Privacy Initiative unambiguously supports such a standard. In view of the far-reaching and multifaceted character of the right to privacy, such a standard imports an impermissible

inflexibility into the process of constitutional adjudication." "[S]ome aspects of the state constitutional right to privacy—those implicating obvious government action impacting freedom of expression and association—are accompanied by a 'compelling state interest' standard." (*Hill*, *supra*, at p. 34.) "Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest. If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed." (*Ibid*.)

Such a general balancing test is called for here. We do not deal with a statute authorizing government action or forbidding private conduct that invades the privacy or autonomy of the marital unit. No state action is involved. No forced disclosure is legislated. And no penalties are imposed by the statutes. (See generally, *John B. v. Superior Court (Bridget B.)* (2006) 38 Cal.4th 1177, 1200.)

It is Anita who is throwing open the marriage to judicial intervention, not the state that is seeking out Lawrence's private secrets. And Anita is as much a holder of the marital privacy right as is Lawrence. When a spouse in an intact marriage opts to abandon her own privacy interests to obtain the support to which she is entitled, we give the right to spousal support more weight than the sued spouse's privacy interest. (See Evid. Code, § 984 [marital communication privilege not applicable in suits between spouses]; § 3551 [marital communication privilege not applicable in actions under Division 9].)[13] We think this scheme properly balances the competing interests of the parties. That is all that is required. (*Hill*, *supra*, 7 Cal.4th at pp. 37-38.)

## 2. Due process

Had the case gone to trial, Lawrence would have been entitled to cross-examine Anita about her claims regarding their marital standard of living. Because he is mentally

---

[13] Section 3551 provides: "Laws attaching a privilege against the disclosure of communications between husband and wife are inapplicable under this division. Husband and wife are competent witnesses to testify to any relevant matter, including marriage and parentage." Section 3551, as well as sections 4300, 4303 and 4320, is part of Division 9.

incompetent, appellants claim this right was impaired by allowing an action to proceed under section 4303. But this same concern would be present whenever an incompetent person is engaged in litigation through a guardian ad litem. (Code Civ. Proc., § 372.) We do not conceive of any reason why a suit under section 4303 should be eliminated for one spouse because of the incompetency of the other. (See *In re Marriage of Caballero* (1994) 27 Cal.App.4th 1139, 1148-1154 [spouse with Alzheimer's disease could proceed in family court through appointment of guardian ad litem].)

Nor do we have any special concerns about the ability of cross-examination to uncover the truth in the context of this case. Anita's declarations about the marital lifestyle went unrebutted by appellants—unrebutted, we note, in a record of nearly 1200 pages.

### 3.    Public policy

At their root, appellants' objections to the availability of relief under sections 4300 and 4303 derive from the notion that courts should stay out of the affairs of married couples, that it is bad public policy to allow husbands and wives to sue each other over issues of support during an ongoing intact marriage. Appellants suggest our decision would set a "terrible precedent" by "open[ing] the courts to any spouse who is unhappy with the private financial arrangements within an ongoing marriage," with "no limit on the Court's ability to intrude on the private financial affairs of married people."

The same argument was raised in *Galland*, *supra*, 38 Cal. 265, namely that affording a wife a remedy without a divorce "will tend to breed discord in families, and to encourage discontented wives to abandon their husbands on frivolous pretexts of ill-usage, relying on the Courts to compel the husbands to support them." The Supreme Court rejected the argument in 1869, reasoning that "it might be urged with even more force, that if such redress be denied to the wife in proper cases, dissolute and unprincipled husbands would be encouraged to abuse their wives, by a consciousness that any ill-treatment which stopped short of a lawful ground for divorce, was without redress in the Courts." (38 Cal. at p. 272.) We reject the argument today, with the observation

22

that the same may be said about trustees who fail to abide by their trustor's level of support.

We are doubtful our decision will have the dire consequences predicted by appellants. We see no threat to the integrity of the marriage before us, as the bulk of Anita's testimony consisted of a fond recollection of the lifestyle she and Lawrence had enjoyed during his better days. This is not a case where a court was asked to micromanage a cohabiting, fully competent married couple's finances. Nor one where the husband had been tight-fisted throughout the marriage and the wife now tries to improve her lifestyle by seeking a higher standard of support after he has lost his capacity to object. What we have, and it is all we have, is that Anita's spousal support was significantly reduced after her husband's incapacity, and her request only to be returned to the previously established standard. No public policy, nor one asserted in the name of marital harmony, or privacy, or autonomy, is offended by the decision we make today.

### 4.    No exclusive jurisdiction in Probate Court

Running through appellants' arguments is the thread that Anita should have brought her petition in probate court. It is, they claim, really an action to compel the trustees to exercise their discretion in a given manner, and thus the probate court alone had jurisdiction over the "internal affairs" of the LWT.

The Probate Code gives the probate court exclusive jurisdiction over the "internal affairs of trusts" (Prob. Code, § 17000, subd. (a)), but only concurrent jurisdiction over "proceedings" by "creditors . . . of trusts" and "[o]ther actions and proceedings involving trustees and third persons." (*Id.*, subd. (b)(2) & (3).) *In re Marriage of Perry* (1997) 58 Cal.App.4th 1104, 1111, concluded that a child's claim for support against a deceased parent's living trust was that of a creditor and hence subject to concurrent jurisdiction. We reach the same conclusion here.

Appellants' analysis touches upon a fundamental question underlying Anita's petition, namely, whether the trustees have unfettered discretion in the present context, or whether the concept of "support" encompasses the marital standard of living so that the preexisting standard must influence and restrict the trustees' exercise of discretion.

23

Appellants have repeatedly asserted, both below and here, that the courts would not entertain an action such as this if Lawrence were competent to defend it on his own behalf. We echo the trial court's incisive response: "But that presupposes that he would be choosing to do today what his trustees are choosing to do. [¶] And isn't the real determination of what he would choose to do today more what he actually did when he was still competent?" To that we add "Amen."

## II. Appellants Have No Right to Contest an Award of Fees and Costs

As noted, the trial court found that appellants had waived their right to contest the award of fees, as follows: "Although Husband and the Trust contested that this Court has authority to make support orders in an intact marriage under Family Code section 4301 and 4303, they waived the objection and granted the court authority by agreement inherent in their settlement of the petition to enforce the support obligation." In fact, appellants not only settled the support claim, but asked the court to enter a stipulated judgment containing the following provision: "The parties stipulate and agree to give the Court both the jurisdiction and power to make this Stipulated Judgment non-modifiable. Each party waives his/her/its right to make any claim that the Court lacked jurisdiction, exceeded its jurisdiction, lacked power, or exceeded its power by making a separate Stipulation and Order re Non-Modifiable Support . . . ."

Appellants contend this was error, in an argument that purports to have six subparts.[14] We reject the argument.

---

[14] The argument is difficult to comprehend, its heading reading as follows:

"The court erroneously and in violation of public policy 'seems' to have premised its authority to make the March 25, 2011 Order Re Attorneys Fees and Costs on *Kilroy v. Kilroy* (1995) 35 Cal.App.4th 1141 and an alleged waiver by Appellants 'inherent' in their settlement. The actual basis for the order is unclear because there was no finding of an authorized action, only a policy quote from the opinion in *Kilroy*. In addition, the alleged waiver that supposedly 'authorized' the court's order is unintelligible, nonsensical, and has no relationship to the position actually asserted by Appellants. Furthermore, the finding of waiver and its use in this matter is a violation of public policy."

A waiver is the intentional relinquishment or abandonment of a known right. (*Johnson v. Zerbst* (1938) 304 U.S. 458, 464.) Judicial estoppel prevents parties from asserting one position at one point in the proceedings and then taking a subsequent position fundamentally at odds with their original position. (See, e.g., *Law Offices of Ian Herzog v. Law Offices of Joseph M. Fredrics* (1998) 61 Cal.App.4th 672, 679 [judicial estoppel applied where party seeks some judicial relief based on a position the party later attempts to change]; *In re Marriage of Toth* (1974) 38 Cal.App.3d 205, 212 ["California public policy will not permit a litigant 'to blow hot and cold' "].)

Generally, the determination of waiver is a question of fact, and the trial court's finding, if supported by substantial evidence, is binding on the appellate court. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.) When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling. (*Ibid*.) The determination of whether judicial estoppel can apply to the facts is a question of law reviewed de novo, but the underlying factual findings are reviewed for substantial evidence. (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 46.)

As noted, Lawrence filed in the trial court a notice that he intended to assert his privacy rights under the California Constitution, his constitutional due process right to cross-examination, and the marital communication privilege under Evidence Code section 980. Later, following the joinder of the trustees, their attorney's declaration in opposition to Anita's request for attorney fees noted that up until the settlement Lawrence's objections and arguments had not been adjudicated. So, despite the settlement, counsel reasserted in the fees hearing the privacy, due process and privilege claims appellants had raised with regard to the underlying action. Appellants now contend these actions and statements preserved the issue for appeal.[15]

---

[15] Appellants go so far as to assert that the court was "estopped" from finding waiver, because at the hearing on attorney fees the court stated that appellants had not waived these arguments. They cite no authority for such a claim, and well-settled law is to the contrary, as we recently confirmed in *Transport Insurance Company v. TIG*

25

Regardless of whether the issue is considered one of waiver or judicial estoppel, the fact is that appellants sought the aid of the court to enshrine their settlement with Anita in an order and to make it nonmodifiable, waiving any claims about the court's jurisdiction and power as part of that process. Put otherwise, appellants' stipulation to the court's jurisdiction to make the settlement non-modifiable also encompassed an implied affirmation that the court had the authority to make a support order in the first instance. There was a clear inconsistency between that position and the position now asserted by appellants that the claim under section 4303 was "unauthorized."

Appellants assert in their reply brief, however, that Anita is herself estopped from claiming attorney fees because she signed the 2005 Advance Agreement, citing the recent case of *In re Marriage of Guilardi* (2011) 200 Cal.App.4th 770, 773-774. Passing over whether appellants have forfeited this argument because it was not raised as a bar to the award of attorney fees in the trial court[16] (see *Honig v. San Francisco Planning Dept.*

---

*Insurance Co.* (2012) 202 Cal.App.4th 984, 1009: "[T]he rule [is] that oral remarks or comments made by a trial court may not be used to attack a subsequently entered order or judgment. (*Farwell v. Sunset Mesa Property Owners Assn., Inc.* (2008) 163 Cal.App.4th 1545, 1552-1553; *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 667; *City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 54.) This is one application of the principle that it is what the lower court did—as opposed to what it said—that an appellate court reviews. '[I]t is well settled that it is judicial action and not judicial reasoning or argument which is the subject of review [citation] and oral opinions or statements of the court may not be considered to reverse or impeach the final decision of the court which is conclusively merged in its findings and judgment.' [Citations.]"

In fact, the court took the matter under submission at the close of the hearing, promising to review the entire file before making its ruling. And the filing of the stipulated judgment occurred on March 18, 2011, between the time of the fee hearing (January 27) and the time of the written order (March 25). That the court may have reconsidered its earlier position based on its review of the record and the stipulated judgment is not improper.

[16] Appellants did claim in opposition to the joinder motion that the release Anita signed as part of the Advance Agreement prohibited her from seeking support from the LWT and its Trustees. In briefing on the fees motion, however, appellants referred to the Advance Agreement waiver only as an "[e]quitable consideration[] for the court to weigh," not as a complete bar to recovering attorney fees.

26

(2005) 127 Cal.App.4th 520, 530), the argument would fail on the merits, as *Guilardi* is distinguishable. In *Guilardi,* a husband and wife had signed a marital settlement agreement that contained a provision allowing attorney fees to the *prevailing* party in any future litigation concerning the agreement. (*Id.* at p. 773.) The Sixth District held this provision constituted an implicit waiver of statutory attorney fees, and barred the wife from seeking attorney fees for her *unsuccessful* attempt to set aside the settlement agreement. (*Id.* at pp. 773-776.) Here, we do not deal with a marital settlement agreement, or any agreement, between husband and wife; and we are not asked to decide between the enforceability of a prevailing party provision for attorney fees and fees otherwise to be awarded under sections 2030 and 2032.

Moreover, the waiver of future claims was contained in an agreement Anita signed with the LWT, not with Lawrence himself. Lawrence's own duty of support, and his corresponding liability for attorney fees, could not be abrogated by an agreement Anita signed with the LWT.

Were all that not enough, we note that Lawrence himself requested professional fees and costs in his response to the petition, signed by Frederick as guardian ad litem. And appellants' briefing in the trial court did not question the court's authority to award attorney fees, but rather disputed what would be a reasonable amount.

### IV. The Amount Of The Award Is Supported

Lastly, appellants contest the amount of the attorney fees and costs awarded. We may interfere with such an award only if it constituted an abuse of discretion. (*In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 881; *In re Marriage of Joseph* (1990) 217 Cal.App.3d 1277, 1287.) We find none.

Appellants preliminarily contend that the court erred in referring to sections 2030 and 2032 in its award of fees, claiming those sections apply only in cases involving dissolution, legal separation, or nullity. We reject this argument on the basis that appellants forfeited it by failing to object—indeed, expressly relying on—the very sections they now claim to be inapplicable. Appellants' briefing below referred liberally to sections 2030 and 2032, and only after the order was issued did appellants object to

any reliance on those sections. They cannot now be heard to complain.[17] (See *Transport Ins. Co. v. TIG Ins. Co., supra,* 202 Cal.App.4th at p. 1000 [doctrine of invited error.)

Anita claimed total attorney fees and costs through December 31, 2010, of $791,696. She sought fees for her estate planning and probate counsel dating back to August 2008, two months after Lawrence was moved to the dementia care facility and 20 months before she filed the family law action. She also sought fees for her family law counsel Blacker and her forensic accountant. Appellants claimed they had expended $590,536.87 for attorney services dating back to November 2009. The court found that, given the complexity of the case and the quality of the representation, the fees on both sides were reasonable. The court also found that Anita's fees were justified, even though some were incurred long prior to the filing of the petition. We have no reason to upset those findings.

The court reached its fee award using the following thoughtful reasoning. The court thoroughly analyzed the respective assets of the parties, including that as of December 31, 2010, the LWT had liquid assets of roughly $16.4 million, and illiquid assets (not including the two residences) with a net book value of more than $22.5 million. The court then determined that the net liquid assets of the LWT, taking account of future obligations, were $3.2 million.[18] Anita's liquid assets were approximately $250,000, which amounted to approximately 7.3 percent of the combined liquid assets of Anita and the LWT. Anita should therefore pay 7.3 percent of the combined fees—$1,382,232—for both sides. That 7.3. percent was calculated at

---

[17] We question whether the court actually awarded fees under sections 2030 and 2032, or whether it merely referred to them by analogy. The court also cited *Kilroy,* which clearly established that attorney fees under section 4303 are available by exercise of the court's inherent equitable power, not by dint of any statute. (35 Cal.App.4th at p. 1146.)

[18] Lawrence's estate plan provides for Frederick and William each to receive $3.5 million. The court deducted those amounts from the LWT's $16.4 million in liquid assets, as well as $6.2 million needed to fund the charitable remainder trust for Anita upon Lawrence's death.

$100,777, which was deducted from Anita's fees and costs, leaving Lawrence responsible for $689,223.

The Trustees claim they have a duty to conserve trust assets in order to pay for Anita's nonmodifiable allowance of $55,000 per month and to continue to provide for Lawrence's care, whose living expenses were $303,714 annually in 2009. The Trustees also point to their duty to conserve trust assets in order to provide for the bequests to Lawrence's adult children (who are also Trustees), to fund the $6.2 million charitable remainder annuity trust for the benefit of Anita, and to fund the Foundation. The first two future needs were taken into account in the court's calculation. As to the Foundation, no specific bequest was made to it, the residual beneficiary under Lawrence's estate plan.

The court did omit illiquid assets from the calculation, unwilling to force either party to sell or mortgage their real estate or other illiquid holdings. (See *In re Marriage of Kerry* (1984) 158 Cal.App.3d 456, 464.) Appellants cite no authority for their contention that the "disparity in access" language of section 2030, subdivision (a)(2) required Anita to sell or encumber the real property she had just acquired through the settlement. (Cf. *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 659-663 [assessment of need is of relative need; court considered only liquid assets].)

Appellants also fault the court for failing to consider all relevant factors, including the LWT's expenses, eroding assets, the speculative value of its illiquid assets, and its lack of autonomy in disposing of those assets because ownership was shared with third parties. These issues were put before the trial court and presumably were taken into account. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526 [presumption of official duty regularly performed by judge].)

Finally, we find no merit to appellants' contention that the court failed to consider a recent amendment to section 2030, subdivision (a) (2) that required consideration of "disparity in access to funds to retain counsel." The amended version of the law was cited and argued to the court. There is no reason to believe the court ignored the change in language. (Evid. Code, § 664.) Appellants' citation to *In re Marriage of Keech* (1999)

29

75 Cal.App.4th 860 is particularly inapt.  There, the court's orders for support and fees, together with the husband's own rent and taxes, left him with only $93 per month to live on and without funds to pay his own attorney.  (*Id*. at p. 867.)

The trial court carefully analyzed the necessary and appropriate criteria thoroughly, and carefully explained its reasoning.  Its order is fully supported.[19]

## DISPOSITION

The order awarding attorney fees is affirmed.  Anita shall recover her costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Lambden, J.

---

[19] Anita observes that while she "has decided not to burden this court further by requesting sanctions . . . [n]onetheless this court may very well conclude, on its own, that this is an appeal which no reasonable attorney should have pursued"—that it is "patently frivolous."  Although we have determined the appeal to be without merit, we do not find it was "frivolous or taken solely for delay."  (Code Civ. Proc., § 907; Cal. Rules of Court, rule 8.276(a)(1).)  Thus, no sanctions will be assessed.  As recognized by our California Supreme Court, "any definition [of a frivolous appeal] must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal.  Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal.  An appeal that is simply without merit is not by definition frivolous and should not incur sanctions.  Counsel should not be deterred from filing such appeals out of a fear of reprisals."  (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)