Filed 9/23/16  1101 Dove Street v. 1101 Dove Street Owners' Assn. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| 1101 DOVE STREET, | |
| Plaintiff and Appellant, | G051250 |
| v. | (Super. Ct. No. 30-2012-00599543) |
| 1101 DOVE STREET OWNERS' ASSOCIATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Peter J. Wilson, Judge.  Affirmed.

Bidna & Keys, Richard D. Keys and Howard M. Bidna for Plaintiff and Appellant.

Hatton, Petrie & Stackler, Arthur R. Petrie II and John A. McMahon for Defendant and Respondent.

\*        \*        \*

A business condominium owner erects a sign advertising its own business in the condominium complex's common area. The condominium owner sues the condominium owners association, seeking declaratory relief that it has the right to maintain the sign where it is. The trial court, after a bench trial, enters judgment in favor of the owners association. On appeal, we affirm.

The agreement for the purchase of the business condominium did not give the condominium owner the right to place the sign in the common area without the prior approval of the owners association and its architectural review committee. Nothing in the covenants, conditions, and restrictions applicable to the complex created a license, easement, or other right in the condominium owner to erect the sign. The owners association's failure to object to the sign before it was put up is not an approval of the sign because the condominium owner never provided the owners association with the specifics of the sign's size, orientation, location, or other elements.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 2006 and 2007, Dove Street Condos Inc. (the Developer) developed an office condominium project on Dove Street in Newport Beach. A declaration of covenants, conditions, and restrictions and grant of easements applicable to the property (the CC&R's) was recorded by the Developer on July 30, 2007. In September 2007, the 1101 Dove Street Owners' Association (the Association) was formed to manage the common interest development. (Civ. Code, former § 1363; see Civ. Code, § 6750.)

In November 2007, the law firm of Garrett & Heaton, LLP, entered into a written purchase agreement with the Developer to buy two units in the building for $1,807,200. (Thomas Garrett and Richard Heaton were the partners of Garrett & Heaton, LLP.) Garrett & Heaton, LLP, assigned its interest in the agreement to 1101 Dove Street, a California general partnership (the Partnership). The Partnership negotiated signage rights as part of its deal; an addendum to the agreement reads, in relevant part: "Seller to

2

install signage for Buyer [(the Partnership)] in compliance with all applicable governmental ordinances provided Seller to exercise best efforts to maximize the size permitted, at Buyer's expense." Before escrow closed, there were no discussions about the type of sign the Partnership would have.

There are two types of outdoor signs discussed in this case: eyebrow signs, which are affixed to the outside of the building near the roofline, and monument signs, which are free-standing signs mounted on concrete pads, separate from the building.

Escrow closed in May 2008. Throughout the time between the execution of the purchase agreement and the close of escrow, the Partnership discussed the use of an eyebrow sign with the Developer and a sign contractor. On June 5, 2008, the Partnership made its first direct reference to specifically wanting a monument sign. On June 11, the Partnership submitted a request for approval of the artwork for the monument sign to the Developer. On June 13, the Developer asked the Partnership for clarification because the Developer thought the Partnership was interested in an eyebrow sign. The Partnership did not respond in writing to the June 13 request, but one of its partners testified that he had talked with the Developer about it.

On December 2, 2008, the Partnership wrote a letter resubmitting the June 11 request for a monument sign to the new property manager. The property manager replied that the architectural review committee was looking into what signage was permitted and would grant or deny the Partnership's request for a monument sign once the criteria were determined. The Partnership never received anything saying yes or no to the proposed monument sign request. The Partnership admitted it never submitted anything to the architectural review committee, the Association's board, or the property manager, which showed the proposed location, dimensions, or orientation of the sign.

The Partnership knew it needed approval from the Association's architectural review committee before erecting any signs, as evidenced by a November 2009 e-mail in which Garrett wrote: "Let's all talk asap. Why are we paying

3

for the sign until we know whether we can put it up—meaning until we have a permit and architectural committee approval?" While Heaton was the president of the Association's board of directors, Attorney Daniel Nordberg was hired to provide a legal opinion letter, in which he opined that the Partnership had the right to erect a monument sign. The Partnership was aware of objections to the monument sign from other owners, and tried, over a period of several months, to get their agreement.

During the Memorial Day weekend in May 2011, the Partnership caused the monument sign to be installed, at a cost of $12,000. The next day, a board member instructed the property manager to cover the sign and to contact legal counsel regarding legal options for the Association. Heaton, however, ordered the property manager not to cover the sign and not to seek legal advice from any attorney other than Nordberg. In July 2012, a new board of directors for the Association hired new counsel, which drafted a letter to the Partnership, advising that the Partnership had violated the CC&R's and the law, and threatening to remove the monument sign.

In September 2012, the Partnership filed a complaint seeking a declaration that it was entitled to maintain the sign. Following a bench trial, the court issued an oral statement of its intended decision in favor of the Association, and against the Partnership. The Partnership requested a statement of decision, and filed objections to the proposed statement of decision submitted by the Association. The trial court issued a statement of decision and entered judgment in favor of the Association.

DISCUSSION

I.

*STANDARD OF REVIEW*

The trial court's factual findings are subject to review for substantial evidence. Questions of law and interpretations of written agreements are reviewed de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801.)

4

*DO THE CC&R'S AND THE PURCHASE AGREEMENT GIVE THE PARTNERSHIP THE RIGHT TO ERECT A MONUMENT SIGN IN THE COMMON AREA OF THE ASSOCIATION'S PROPERTY?*

The Partnership contends that the purchase agreement, read in conjunction with the CC&R's, gave it the right to erect the monument sign. The purchase agreement obligated the Developer to install the largest possible sign, at the Partnership's expense, in compliance with city ordinances: "Seller to install signage for Buyer in compliance with all applicable governmental ordinances provided Seller to exercise best efforts to maximize the size permitted, at Buyer's expense." That agreement did not create any license, easement, or other right in the Partnership to have any particular sign installed in the Association's common area.

The CC&R's create restrictions on the condominium owners' ability to erect signs anywhere on the property. Those restrictions do not apply to the Developer with regard to signs used "in connection with the original construction and sale of the Units."[1]

---

[1] Section 8.7 of the CC&R's provides: "Signs. Each individual Owner shall be responsible for the cost of erecting and maintaining any and all identification signs as provided for herein. The location, size and style of signs within the Project are a matter of paramount importance in the development of a first-class office complex. Therefore, no signs, posters, displays or other advertising devices of any character shall be erected or maintained on, or shown or displayed from, the Units without the consent and approval of the City and of the Architectural Committee and a determination thereby of conformity with standards to be established by the Architectural Committee. Notwithstanding anything herein to the contrary, no sign of any kind shall be displayed on any portion of the Project except such sign or signs which strictly conform to the regulations of the City, as amended or supplemented from time to time. The Board, at its election, may summarily cause all unauthorized signs to be removed and destroyed, or, at the expense of the offending Owner to be brought into conformity with this Declaration and any sign standards adopted hereunder. This Section 8.7 shall not apply to any signs used by Declarant or its agents in connection with the original construction and sale of the Units."

The CC&R's also provide that there is no restriction on the Developer's right to construct improvements on the property.[2] That right may be assigned by the Developer to a successor in interest.[3] Using these provisions of the CC&R's, the Partnership argues that the Developer, through the purchase agreement, assigned to the Partnership its right to build a sign in the common area. This argument fails for at least

---

[2] Section 7.1 of the CC&R's provides: "Construction and Modification. Nothing in the Restrictions limits, and no Owner or the Association may do anything to interfere with, the right of Declarant to (a) subdivide or resubdivide any portion of the Property, (b) complete or modify Improvements to and on the Common Property or any portion of the Property owned solely or partially by Declarant, (c) alter the foregoing or its construction plans and designs, (d) modify its development plan for the Property, including without limitation creating Units and constructing Improvements of larger or smaller sizes, values, or of different types, or (e) construct such additional Improvements as Declarant deems advisable in the course of development of the Property so long as any Condominium in the Project remains unsold. Declarant's rights hereunder include, but are not limited to, the right to install and maintain such structures, displays, signs, billboards, flags and sales offices as may be reasonably necessary to conduct Declarant's business of completing the work and disposing of the Condominiums by sale, resale, lease or otherwise. Each Owner, by accepting a deed to a Condominium, hereby acknowledges that Declarant's activities may temporarily or permanently constitute an inconvenience or nuisance to the Owners, and hereby consents to such impairment, inconvenience or nuisance. This Declaration does not limit Declarant's right, at any time prior to acquisition of title to a Condominium in the Project by a purchaser from Declarant, to establish on that Condominium additional licenses, easements, reservations and rights-of-way to itself, to utility companies, or to others as may be reasonably necessary to the Property's proper development and disposal. . . . Declarant need not seek or obtain Architectural Committee approval of any Improvement Declarant constructs or places on any portion of the Property."

At the time the Developer allegedly granted to the Partnership the right to erect its monument sign, there were unsold units in the complex.

[3] Section 7 .2 of the CC&R's provides: "Successors and Amendment. Declarant may assign its rights under the Restrictions to any successor in interest to any portion of Declarant's interest in any portion of the Property by a written assignment. Notwithstanding any other provision of this Declaration, no amendment may be made to this Article VII without the prior written approval of Declarant. Each Owner hereby grants, upon acceptance of its deed to its Unit, an irrevocable, special power of attorney to Declarant to execute and Record all documents and maps necessary to allow Declarant to exercise its rights under this Article."

two basic reasons.  First, section 1.18 of the CC&R's defines "successor" as "a Person who acquires either [the Developer] corporation or substantially all of such corporation's assets, or who merges with either [the Developer] corporation, by sale, merger, reverse merger, consolidation, sale of stock or assets, operation of law or otherwise."  Thus, the purchase agreement did not make the Partnership a successor of the Developer.  (If it did, *all* condominium owners would be successors of the Developer for various provisions within the CC&R's.)

Second, section 7.2 of the CC&R's requires a written assignment of the Developer's right to construct improvements.  The addendum to the purchase agreement regarding the right to erect a sign does not serve as a written assignment.

For the following reasons, we also reject the Partnership's argument that the Association should be deemed to have approved the monument sign because it did not reject the request or request additional information within 45 days after the Partnership submitted its request.

Section 4.2 of the CC&R's, which addresses review of plans by the architectural review committee, provides, in relevant part:  "The Committee shall consider and act upon all plans and specifications submitted for its approval under this Declaration and perform such other duties as the Board assigns to it . . . .  No construction, installation or alteration of an Improvement in the Property may be commenced or maintained until the plans and specifications therefore showing the nature, kind, shape, height, width, color, materials and location thereof have been submitted to and approved in writing by the Committee. . . . [The Developer] and any Person to whom [the Developer] may assign all or a portion of its exemption hereunder need not seek or obtain Architectural Committee approval of any Improvements constructed on the Property by [the Developer] or such Person.  [¶] . . . The Committee shall transmit its decision and the reasons therefore to the Applicant . . . within forty-five (45) days after the Committee receives all required materials.  Any application submitted pursuant to this

Section 4.2 shall be deemed approved unless the Committee transmits written disapproval or a request for additional information or materials to the Applicant within forty-five (45) days after the date the Committee receives all required materials."

It is undisputed that the request provided by the Partnership to the Developer, and later copied to the property manager, did not show "the nature, kind, shape, height, width, color, materials and location" of the proposed monument sign. Therefore, the request did not contain "all required materials," and the 45-day approval period never started.

As explained, *ante*, the Partnership is not a successor of the Developer for purposes of the Developer's exemption under section 4.2 of the CC&R's.

III.

*DID THE ASSOCIATION LACK STANDING TO OBJECT TO THE MONUMENT SIGN?*

The Partnership argues that the Association did not have standing to object to the monument sign because one of the first members of the Association's board, John Fitzgibbon, had signed the purchase agreement on behalf of the Developer. Standing is generally a concept reserved for deciding whether the plaintiff is the real party in interest. "The purpose of a standing requirement is to ensure that the courts will decide only actual controversies between parties with a sufficient interest in the subject matter of the dispute to press their case with vigor. [Citations.] This purpose is met when, as here, plaintiffs possess standing to have the underlying controversy adjudicated and the desired relief granted after a trial on the merits." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439-440.)

This argument is really an argument that the Association should be imputed to have the same knowledge that the Developer had regarding the signage rights allegedly granted to the Partnership in the purchase agreement. The Partnership fails to establish that this issue was before the trial court. It does not appear in the list of controverted issues, nor is it addressed in the Partnership's trial brief. And the Partnership's appellate

8

briefs do not provide any citation to the reporter's transcript showing where the issue was discussed, or what evidence was presented on it.

The Association was properly organized as a nonprofit mutual benefit corporation. The Partnership has not offered any proof that it is not a separate and distinct entity from the Developer.

IV.

*IS THE ASSOCIATION ESTOPPED FROM OBJECTING TO THE MONUMENT SIGN?*

The Partnership argues that the Association was equitably estopped from objecting to the monument sign. "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623.) Whether there is an estoppel is a question of fact; "normally it must be pleaded, either as a part of the cause of action or as a defense." (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 191, p. 529.)

The Association argues that the Partnership failed to plead equitable estoppel. We disagree. The Partnership's complaint alleged that, in reliance on the purchase agreement, the statements of the Association's counsel, and the Association's failure to object to the Partnership's stated intention to build the monument sign, it spent its own money to erect the monument sign. The application of the estoppel doctrine was discussed in the Partnership's trial brief, and was raised as a controverted issue before trial. The authorities do not require that estoppel be alleged as a separate cause of action; it must be "pleaded in the complaint with sufficient accuracy to disclose facts relied upon." (*Chalmers v. County of Los Angeles* (1985) 175 Cal.App.3d 461, 467.) The issue was properly and sufficiently raised by the Partnership. (Compare *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1013 [equitable estoppel theory not advanced where complaints did not plead any facts regarding estoppel or identify any statement of

9

fact by the defendants that the plaintiff reasonably relied on, and where the issue was not mentioned in the trial brief].)

The trial court found that "no conduct by the Association gives rise to an estoppel here." This finding is supported by substantial evidence. At the time the monument sign was erected, the Partnership knew the Association's board and architectural review committee had both refused to approve the sign, and that other owners in the complex were strongly opposed to it. To the extent the attorney's letters led the Partnership to believe the Partnership had the right to build the sign, the lack of approval by the board or the architectural review committee and the active, vocal opposition by the Association's members would refute the elements of an estoppel. In this context, the letter from the Association's legal counsel, Nordberg, is insufficient to create an estoppel against the Association.

DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.

10